**In re AMERICAN HONDA MOTOR CO., INC. DEALERSHIPS RELATIONS LITIGATION.**

**Civil No. MDL–95–1069.**

United States District Court,
D. Maryland.

Aug. 30, 1996.

**534**

Richard B. McNamara, Wiggin & Nourie, Manchester, NH.

William A. Kershaw, Kronick, Moskovitz, Tiedemann & Gerard, Sacramento, CA.

Robert B. Green, Baltimore, MD.

James Ulwick, Kramon & Graham, Baltimore, MD.

Robert A. Van Nest, Keker & Van Nest, San Francisco, CA.

Jeremiah T. O'Sullivan, Choate, Hall & Stewart, Boston, MA.

Harvey G. Sanders and Tammy McKnew, Leatherwood, Walker, Todd & Mann, P.C., Greenville, SC.

Michael M. Baylson, Duane, Morris & Heckscher, Philadelphia, PA.

Norman C. Hile, Orrick, Herrington & Sutcliffe, Sacramento, CA.

Christopher J. Hunt, Bartko, Zankel, Tarrant & Miller, San Francisco, CA.

Lawrence Silver, Lawrence Silver & Associates, Long Beach, CA.

Andrew W. Stroud, Orrick, Herrington & Sutcliffe, Sacramento, CA.

Mark P. Rapazzini, Rapazzini & Graham, San Francisco, CA.

Daniel G. Clodfelter, Moore & Van Allen, Charlotte, NC.

Price O. Gielen, Neuberger, Quinn, Gielen, Rubin & Gibber, P.A., Baltimore, MD.

Thomas X. Glancy, Jr., Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, Baltimore, MD.

## OPINION

MOTZ, Chief Judge.

The plaintiffs in this multidistrict litigation case are current and former Honda dealers seeking recovery for losses suffered as the result of fraudulent schemes involving the sale and distribution of Honda and Acura automobiles during the 1980's and early 1990's. The four core defendant groups are: (1) American Honda Motor Co., Inc. and Honda North America, Inc., the domestic companies responsible for the distribution of Honda and Acura automobiles to dealers;[1] (2) Honda Motor Company, Ltd., a Japanese company and the corporate parent of the domestic Honda entities ("Honda Japan")[2]; (3) a number of current and former Honda dealers, including Richard Brooks, Dah Chong Hong Ltd. and affiliated entities, Peter Epsteen, Joseph Hendrick, Henry Khachaturian and Mid–Peninsula Motors, the estate of Martin Lustgarten, Cliff Peck, John Rosati, and WESH, Inc.; and (4) Lyon & Lyon, American Honda's law firm. Four "representative" complaints have been filed.

The *Borman* complaint is the central complaint in this case. It has been individually brought by a handful of dealers, including Borman Motor, a New Mexico dealer. It also seeks relief on behalf of a broad class of plaintiff dealers, although plaintiffs have not yet sought class certification. *Borman* asserts claims against all of the defendants, including American Honda, Honda Japan, a number of dealers, a number of current and former Honda executives, and Lyon & Lyon. The complaint alleges a number of illegal acts involving these defendants, including:

- that Honda wrongfully misallocated cars on the basis of bribes paid by dealers (the "misallocation scheme")

---

1. Although the complaints generally allege that Honda North America owned American Honda and coordinated North American distribution of Honda automobiles, there is a perplexing lack of discussion from either plaintiffs or defendants as to the specific role of Honda North America in this case. My opinion therefore focuses on the claims against American Honda and Honda Motor Company, Ltd.

2. Because of the distinctly different issues presented by American Honda Motor Company, Inc. and Honda Motor Company, Ltd. and the possibility of confusion of names, I will for ease of identification refer to Honda Ltd. as "Honda Japan" throughout this opinion.

- that Honda pressured dealers to participate in sales training seminars offered by a vendor that paid kickbacks to Honda executives (the "sales training scheme")
- that Honda pressured dealers to participate in group advertising activities provided by an advertising firm that paid kickbacks to Honda executives (the "dealer ad group scheme")
- that Honda awarded "Letters of Intent" for new dealerships on the basis of bribes and kickbacks
- that Honda executives, prompted by attorneys at Lyon & Lyon, committed perjury, tampered with witnesses and otherwise obstructed criminal investigations of Honda that took place in the early 1990's
- that Honda falsified tax records to cover up the bribery activities of executives

*Borman* asserts a total of 19 counts. Of these, ten are federal claims:

*Counts 1–4:* RICO §§ 1962(a)–(d) against "all defendants"

*Counts 5–6:* RICO §§ 1962(c), (d) against Lyon & Lyon

*Count 7:* Dealers Day in Court Act against the Honda entities

*Count 8:* Robinson–Patman § 2(c) against "all defendants"

*Count 9:* Sherman Act § 1 against "all defendants"

*Count 10:* Sherman Act § 2 against the Honda entities [3]

The remaining claims are for common law fraud, negligence, breach of contract, tortious interference and conspiracy.

*Breakaway* is a complaint filed by a South Carolina dealer, Breakaway Honda. Unlike *Borman*, this complaint names only two sets of defendants: (1) individuals and entities affiliated with Joseph "Rick" Hendrick, a South Carolina dealer (Hendrick); and (2) the Honda defendants. *Breakaway* otherwise mirrors *Borman*. Like *Borman*, this complaint brings claims against Honda for violations of RICO; the Dealers Day in Court Act; the Robinson–Patman Act; and the Sherman Act. In addition, *Breakaway* brings claims specifically against Hendrick

under RICO sections 1962(a)–(d). *Breakaway* also asserts nine South Carolina law counts, including common law fraud, negligence, breach of contract, estoppel and violations of the state Unfair Trade Practices and Manufacturers, Distributorships and Dealers Acts.

*Austin Motors* is a complaint brought individually by Austin Motors, Inc., a New York dealer. The complaint is similar to *Breakaway* in that it names both the Honda defendants and a competing New York/New Jersey dealer, Dah Chong Hong Trading Corp. Unlike *Breakaway*, however, *Austin Motors* also names Lyon & Lyon and a number of Honda executives. *Austin Motors* also offers some additional factual allegations about specific ways that cars were misallocated in the New York/New Jersey area. Like the other complaints, however, *Austin Motors* asserts claims for violations of RICO; the Dealers Day in Court Act; the Robinson–Patman Act; and the Sherman Act. The complaint also states seven common law counts, one count for violation of New York's Franchised Motor Vehicle Dealer Act and one count for unfair business practices under California law.

*Trans–Oceanic* is a complaint brought individually by Trans–Oceanic Motors, a Connecticut dealer doing business as "Cardinal Honda." This complaint names only the three Honda entities. It refers to the broad nationwide bribery activities discussed in the other complaints, but *Trans–Oceanic* focuses on Honda's role in placing a competing dealership fifteen miles from Cardinal's location. The complaint states only three federal claims: violations of RICO sections 1962(a) and (c), and of section 2(c) of the Robinson–Patman Act. These claims are identical to those against Honda in the *Borman* complaint. *Trans–Oceanic* also brings four Connecticut law claims.

Currently at issue are fourteen motions to dismiss. In keeping with my directive that the parties focus their energies on the "heartland" issues in this complex case, these motions seek dismissal only of the various federal counts—including those arising under RICO, the Sherman Act, the Robinson–Pat-

---

**3.** Plaintiffs since have voluntarily dismissed this count. *See infra* section IV.

man Act and the Dealers Day in Court Act. Hearings were held on May 3, 1996 and May 17, 1996.

I have divided this opinion into five parts. The first addresses several general issues related to matters of pleading form and procedure. The second considers defendants' argument that plaintiffs lack standing to bring their federal claims. The third discusses the RICO claims against the various defendants, as well as the question of plaintiffs' claims against Honda Japan. The fourth addresses the antitrust claims. The fifth considers claims brought under the Dealers' Day in Court Act.

## I.

### A. General Form of Pleading

I begin by addressing two problems of form that are present throughout the representative complaints. Defendants argue that the *Borman* and *Breakaway* complaints have impermissibly pled that "Defendant Honda"—"consisting of Defendant Honda Ltd., Honda North America, and American Honda"—is a "person" that can be liable under RICO or the antitrust laws. *See, e.g., Borman* Compl. at ¶¶ 231, 253, 267, 282; *Breakaway* Compl. at ¶¶ 225, 249, 264, 280. Defendants argue that the three corporate Honda defendants cannot be aggregated as a single "person" with shared RICO liability.

■ The *Borman* and *Breakaway* plaintiffs essentially concede this point. Case law also supports defendants' position. *See United States v. Bonanno Org. Crime Family of La Cosa Nostra*, 879 F.2d 20, 27–28 (2d Cir.1989). In any event, plaintiffs later state that they intend this allegation only as a shorthand way of stating that *each* of the three Honda defendants is a RICO "person" individually, something that defendants do not dispute. This shorthand approach is inappropriate. Plaintiffs accordingly should amend their complaints to delineate the specific allegations against each of the named Honda entities, with particular attention to distinguishing the nature of plaintiffs' claims

against Honda America from those against Honda Japan.

■ The dealer defendants note a second, related problem. The *Borman* complaint, which is the broadest complaint in this action, contains a number of claims which, according to their titles, purport to state claims against "all defendants." These claims in *Borman*, however, are substantively addressed only to the Honda defendants. For example, the paragraphs of *Borman*'s section 1962(c) count, *see Borman* Compl. at ¶¶ 281–90, are devoid of any allegation against any non-Honda defendant. This count cannot be construed as implicitly stating claims against the dealer defendants; every sentence of each paragraph specifically makes claims about the conduct of "defendant Honda," not "all defendants." I therefore dismiss these counts as to the non-Honda defendants as a matter of basic pleading specificity. Plaintiffs remain free to amend their complaints, however, to delineate specific RICO claims against the dealer defendants.[4]

### B. Choice of Circuit Law

■ A pending issue throughout the early stages of this multidistrict case has been the question of which circuit's law I should apply. Appendix A to American Honda's memorandum in support of its motion to dismiss summarizes the relevant issues and concludes that the proper solution "is for the court to decide each issue truly independently, using as the single overarching guideline the court's best prediction of what the Supreme Court would do with a given issue, bringing to bear decisions from various circuits on that question." *Id.* at 3–4. As I have indicated previously during the course of hearings and conferences, this would be my general preference, and my analysis below relies on a broad range of case law from different circuits. However, should an issue in this case arise in which I must expressly decide whether to follow either the Fourth Circuit or the well-reasoned view of another circuit, I will follow the Fourth Circuit. As a conceptual matter, this is the appropriate approach according to the presumption that federal

---

4. For example, as I discuss below, the *Breakaway* complaint has pled a valid section 1962(c) count

against one of the dealer defendants.

law is unitary. *See generally In re Korean Air Lines Disaster,* 829 F.2d 1171, 1175 (D.C.Dir.1987) (Ginsberg, J.), *aff'd sub nom. on other grounds, Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989). As a practical matter, moreover, given that the Fourth Circuit retains appellate jurisdiction over my rulings, that court is perhaps better suited to hear an argument that a controlling Fourth Circuit rule is wrongly decided.

## C. Statute of Limitations

Defendants argue that the statute of limitations under both RICO and the antitrust laws limits plaintiffs to damages incurred within four years of the filing their respective complaints, citing the Fourth Circuit's "injury discovery" rule. Plaintiffs responded in part at oral argument on May 17, 1996, but because the bulk of defendants' written argument was contained only in the Schuiling defendants' reply memorandum, the issue has not been extensively briefed.

I need not reach the limitations question at the present time. Although limitations may play a significant role later in this case, it is not dispositive of any claim at this point. Also, as plaintiffs argue, any decision on limitations grounds in this case will be fact-intensive, and the record as it currently exists simply is insufficient. Finally, the circuits are currently divided over the appropriate limitations rule, an issue of considerable potential importance in this case. *See, e.g., Pocahontas Supreme Coal Co. v. Bethlehem Steel,* 828 F.2d 211, 218–20 (4th Cir.1987) (injury rule); *Caproni v. Prudential Secs., Inc.,* 15 F.3d 614, 619–20 (6th Cir.1994) (injury and pattern discovery rule); *Keystone Ins. Co. v. Houghton,* 863 F.2d 1125, 1126 (3rd Cir.1988) (last predicate act rule). It is prudent for me to await any further developments in the law while this litigation is pending.

I briefly note, however, that if I ultimately apply the Fourth Circuit rule, and if in fact some plaintiffs knew or should have known of their injuries dating back to the mid–1980's, they will have to demonstrate the exercise of due diligence in attempting to discover the basis of their claims, and that defendants took affirmative steps to conceal the schemes. If plaintiffs have a good faith belief in such facts, it would be advisable for them to so replead in their amended complaints.

## D. Primary Jurisdiction

 Finally, defendants preemptively urge me to remand consideration of all issues related to California dealerships to the California Motor Vehicle Board. Primary jurisdiction is a discretionary doctrine, however, and I decline to carve issues and parties out of a case that has been consolidated on a nationwide basis for the express purpose of ensuring uniform resolution.

## II.

I next move to the most overarching argument made by all of the various defendants in support of the present motions to dismiss. Defendants assert that plaintiffs have failed to allege sufficient injury to have standing under the RICO and antitrust statutes.[5] Defendants' position is that the RICO claims are fundamentally flawed because each relies on a hypothetical "what should have happened" point of comparison as the basis for the various injuries allegedly caused by the bribery scheme. For example, the claim of injury common to all four representative complaints is that plaintiff dealers lost profits because bribe-paying dealers received unfair allotments of cars. Defendants argue that, because such a claim of injury necessarily assumes that a given plaintiff dealer would have received some other ascertainable allocation of cars absent the corrupt conduct, the inherent uncertainties involved in Honda's allocation process[6] and the multiplicity of

**5.** American Honda's memorandum in support of its motion to dismiss makes this argument, with which all other defendants join. Also, both defendants and plaintiffs agree that standing analysis for both RICO and antitrust claims, at least with respect to injury in fact and proximate causation, is the same. *See Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 267–68, 112 S.Ct. 1311, 1317–18, 117 L.Ed.2d 532

(1992). I will therefore treat them the same, and my analysis below applies equally to the RICO and antitrust claims currently at issue.

**6.** The parties agree that Honda's standard dealership agreement provided for an "85/15" allocation system: 85% of a dealer's monthly allocation was based on that dealer's "travel rate," a rating based on the number of cars sold during

possible legitimate outcomes makes such a theory of injury too speculative to convey standing on plaintiffs.

Plaintiffs respond that they have adequately pled injury and that any difficulties in proof, quantification, or allocation of damages are matters for later stages of this litigation. Plaintiffs' underlying position is that because it is undisputed that bribe-paying dealers received *more* cars than they should have, non-bribe-paying dealers necessarily received *fewer* cars than they should have. Plaintiffs argue that the logical inescapability of this reasoning means that they have been injured by the bribery scheme, even if it is not currently known, for example, *how many more* cars any given plaintiff dealer should have received.

■ RICO's civil damages provision, 18 U.S.C. § 1964(c), countenances suits by any person "injured in his business or property by reason of a violation of section 1962." This language requires a plaintiff to make two showings: "(1) that he has suffered injury to his business or property; and (2) that this injury was caused by the predicate acts of racketeering activity that make up the violation of § 1962." *Brandenburg v. Seidel*, 859 F.2d 1179, 1187 (4th Cir.1988); *see also Mid Atlantic Telecom, Inc. v. Long Distance Servs., Inc.*, 18 F.3d 260, 263 (4th Cir.), *cert.*

*denied*, — U.S. —, 115 S.Ct. 323, 130 L.Ed.2d 283 (1994). These injury and causation elements are aspects of standing that must be established as a threshold matter by a civil RICO plaintiff. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496–97, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985).

■ Defendants challenge plaintiffs' standing in terms of both the injury and the causation requirements. Although the four representative complaints articulate several different theories of injury, they agree on one basic claim: that plaintiff dealers were deprived of profits when bribe-paying dealers unjustly received extra cars.[7] I accordingly focus on this claim in my analysis below. I conclude that plaintiffs have satisfied the injury and causation requirements. The complexity of quantifying any given plaintiff dealer's loss will be of central concern later in this litigation, but plaintiffs have alleged injury to their businesses caused by the bribery scheme. That is enough to survive defendants' motion to dismiss for lack of standing.

### A. Injury

■ Dismissal for lack of injury is appropriate where the claimed injury is not cognizable as a legal matter, not where the claimed injury is not easily susceptible to proof. Whether plaintiffs' claims of "alloca-

---

previous months, and 15% was allocated on a discretionary basis by the Honda zone manager. This 15% discretionary allocation was to be based on commercially reasonable factors; for example, a zone manager may decide to allocate extra "discretionary" cars to a new dealership in order to spur initial sales.

Plaintiffs claim that bribe-taking zone managers initially misallocated cars out of the discretionary allocation. Plaintiffs also allege, however, that the 85% "travel rate" component of the allocation formula multiplied the effect of the initial "discretionary" misallocations. In other words, each misallocated car sold by a bribe-paying dealer increased that dealer's travel rate, entitling that dealer to a greater unfair share of cars in subsequent months.

7. All four of the representative complaints allege injury in the form of lost profits caused by improper misallocation of cars. This "allocation injury" is *Borman*'s sole claim of injury; moreover, the *Borman* complaint alleges only the loss of *direct* profits that would have obtained from the sale of each misallocated car. *Borman* thus

articulates the most basic claim of injury. The other complaints contain additional descriptions of related losses, such as lost profits that would have obtained from aftermarket activities associated with the sale of a new car.

In addition, *Austin, Breakaway* and *Trans–Oceanic*—each of which are actions brought by individual plaintiff dealers—also allege lost profits caused by the bribe-influenced placement of a competing dealer within a plaintiff dealer's market. *Breakaway* additionally claims that the improper placement of a competing dealer caused the value of plaintiff's dealership to decline.

Finally, the complaints allege several categories of out-of-pocket costs. *Breakaway* claims injury for the costs it incurred to prepare its bid for a "rigged" dealership award process; defendants concede that this claim satisfies the injury requirement. *Borman* also refers generally to out-of-pocket costs in each of its injury paragraphs, but is not more specific; these costs may refer to fees paid by plaintiff dealers to participate in the fraudulent advertising and sales training schemes that plaintiffs allege were part of the pattern of racketeering activity.

tion injury" are legally cognizable involves two distinct issues. First, as in any federal case, plaintiffs must satisfy the familiar "injury-in-fact" standard required by Article III. Second, section 1964(c) expressly conditions standing on "injury *to business or property.*" Different circuits accordingly have fashioned rules allowing standing only, for example, to plaintiffs complaining of commercial harm or "concrete financial loss." *E.g., Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 103–04 (2d Cir.1990) (holding that "business or property" refers only to "commercial interests or enterprises"); *Oscar v. University Students Co-op. Ass'n*, 965 F.2d 783, 785 (9th Cir.) (requiring "concrete financial loss, and not mere injury to a valuable intangible property interest"), *cert. denied*, 506 U.S. 1020, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992).

 Other than the statutory requirement that a plaintiff's injury must be in the nature of harm to business or property, however, RICO imposes no "heightened" standing threshold. In *Sedima*, the Supreme Court held that the statute's plain language requires only that the plaintiff "has been injured in his business or property by the conduct constituting the violation." 473 U.S. at 496, 105 S.Ct. at 3285. "[T]he statute requires no more than this." *Id.* at 497, 105 S.Ct. at 3285. *Sedima* thereby foreclosed an attempt by several circuits to limit the scope of RICO by granting standing only to plaintiffs alleging a "racketeering injury" distinct from any harm caused by predicate acts themselves. *Id.; see also Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1100 (2d Cir.1988) (noting that section 1964(c) "contains no special limitation on standing"), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1643, 104 L.Ed.2d 158 (1989). Courts have not hesitated, however,

to dismiss RICO claims for lack of standing where plaintiffs have failed to allege a sufficiently palpable injury to business or property.

*1. "Concrete Financial Loss"*

 Addressing RICO's statutory language first, defendants do not directly argue that plaintiffs have failed to allege injury to "business or property" as a qualitative matter. Instead, defendants argue that plaintiffs have failed to allege "concrete financial loss," the RICO injury requirement expressly imposed in the Ninth Circuit. *See Oscar*, 965 F.2d at 785. Defendants assert that "concrete financial loss" refers only to out-of-pocket losses and cannot encompass plaintiffs' claims for lost profits. *See* Am. Honda's Mot. to Dismiss at 26 ("[N]one of the plaintiffs ... assert that any identifiable piece of property, sum of money, expenditure, identified contract or out-of-pocket expense moved from their side of a ledger to a defendant's.").

I do not find this argument convincing. Defendants for the most part selectively rely on passages from cases that, based on particular factual settings, discuss out-of-pocket costs as a tangible contrast to more amorphous theories of injury.[8] Moreover, in *Oscar* itself the plaintiff claimed "decreased value of her apartment" and "personal discomfort and annoyance" caused by the conduct of an alleged drug-dealing conspiracy; the Ninth Circuit held that these claims failed to satisfy the "concrete financial loss" requirement because they at most were to a "valuable intangible property interest" and were more in the nature of personal injuries. The allegations of injury in this case are obviously distinguishable.

---

**8.** For example, defendants emphasize that *Fleischhauer v. Feltner*, 879 F.2d 1290, 1300–01 (6th Cir.1989), *cert. denied*, 493 U.S. 1074, 110 S.Ct. 1122, 107 L.Ed.2d 1029 (1990), a case cited with approval by *Oscar*, limited RICO recovery to "money paid out" as a result of racketeering activity. *Fleischhauer*, however, merely held that plaintiffs could recover only their direct investment in a fraudulent scheme and were not entitled to expectancy damages or lost tax benefits. Similarly, in *Steele v. Hospital Corp. of Am.*, 36 F.3d 69 (9th Cir.1994), the Ninth Circuit found that plaintiffs had failed to allege a "concrete financial loss" from an alleged overbilling conspiracy that had caused their medical insurance company to pay out too much in claims; plaintiffs theorized that this had caused them injury because their benefits were depleted as a result of the scheme. The court noted, however, that this was unduly speculative because plaintiffs had not actually paid out any of their own funds. Defendants, however, attempt to rely on a passage from this discussion stating that no "concrete financial loss" occurred "if the patients have paid none of the allegedly excessive charges out of their own pockets." *Id.* at 70–71.

Based on these cases, I therefore do not interpret the "concrete financial loss" requirement—even were I to apply the Ninth Circuit rule in this case—as a *per se* rule that confers standing only to plaintiffs alleging out-of-pocket loss of funds. Instead, it restricts standing to plaintiffs alleging that they have suffered a specific, tangible financial injury. *See Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303, 1310 (9th Cir. 1992) ("[T]he facts alleged do not establish 'proof of concrete financial loss,' let alone show that money was paid out. . . ."), *cert. denied*, 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993).[9] Here, plaintiffs have alleged a tangible business loss: they claim that they should have received more cars than they did, cars that would have been immediately sold for a profit.

Defendants' "concrete financial loss" argument, however, also has a second dimension. Although there is no question that plaintiffs have alleged "financial loss," defendants also argue that plaintiffs' injuries are insufficiently "concrete." For example, in the "concrete financial loss" section of their argument they cite to *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995), where the Second Circuit held that plaintiffs claiming that they had been fraudulently induced into issuing loans had not alleged injury because none of the loans had actually gone into default. Defendants quote from this opinion that "as a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *First Nationwide* is not a "concrete financial loss" case as that rule is used in the Ninth Circuit, however, and the thrust of the court's holding was that the plaintiffs had not alleged "injury in fact," not that they had not alleged

a tangible financial loss. Indeed, defendants' core argument is that, because of the uncertain nature of Honda's allocation system, plaintiffs cannot claim any "clear and definite" loss. This is an argument that plaintiffs' claims are too speculative. I now consider this second aspect of injury—whether plaintiffs have alleged sufficiently real harm.

### 2. Injury in Fact

 Injuries that are speculative or prospective in nature are insufficient to confer standing. This fundamental principle of federal court jurisdiction has been widely applied in RICO cases. Defendants argue that plaintiffs' alleged allocation injuries are too speculative in two respects: (1) they rely on assumptions about past consumer behavior, economic conditions and other factors, and (2) they assume an unascertainable "entitlement" to certain allocations of cars. The first argument fails under established case law. I also find that the second argument does not merit dismissal.

Defendants first posit that "[i]n the Ninth Circuit (whose analysis has not been disavowed or questioned by any other decision of which defendants are aware), when this kind of future profits comprise the sole claimed injury, a RICO claim cannot proceed." Am. Honda's Mot. to Dismiss at 26. They also cite cases holding that a mere "lost opportunity" is not a sufficient injury to confer standing under RICO. *E.g. In re Taxable Mun. Bond Litig.*, 51 F.3d 518, 522–23 (5th Cir.1995) (lost opportunity to obtain a low-interest loan too speculative to constitute injury). Defendants attempt to characterize plaintiffs' claims of injury as alleging a "lost opportunity" to obtain "future profits" on misallocated cars.

Plaintiffs, of course, do not allege that they have lost the opportunity to obtain future

---

9. I construe this statement as indicating that "money paid out" is simply the *most* tangible form of financial loss, not that it is the *only* cognizable form of loss. I note, however, that another court has interpreted this statement as a "suggestion . . . that the Ninth Circuit, to recognize a cognizable RICO injury, might even require proof that plaintiff actually paid money out as a result of racketeering activity." *Sheperd v. American Honda Motor Co., Inc.*, 822 F.Supp. 625, 628 (N.D.Cal.1993) (citing *Imagineering*, 976 F.2d at 1310). To the extent the "concrete

financial loss" rule would in fact require such a showing, I would decline to follow it. Although the RICO "injury to business or property" requirement clearly gives courts some discretion to adopt restrictive rules of standing, an "out-of-pocket" rule goes beyond any plausible meaning. Such a rule would, for example, deny standing to a plaintiff alleging that racketeers demanded *property* (Honda automobiles, for example) instead of money as part of a protection racket. Indeed, plaintiffs in this case effectively allege that cars were "stolen" from them and given to bribe-paying dealers.

profits; they allege that they have lost past profits on cars they should have received. Although not all circuits have expressly so held, the clear trend is that lost profits are remediable in RICO, notwithstanding the fact that any lost profits calculation inherently involves some assumptions about what would have happened in the past. *E.g., Id.* at 523 (noting as illustrative example that defendant had failed to allege lost profits, and therefore had not pled injury); *Advanced Bus. Sys., Inc. v. Philips Information Systems Co.,* 750 F.Supp. 774, 778 (E.D.La.1990) (" 'injury to business or property' . . . can include lost profits, subject to proof of such proximately caused damages"); *see also Mid Atlantic Telecom,* 18 F.3d at 261 (allowing standing based on alleged losses of revenues and customers); *Mylan Labs., Inc. v. Akzo, N.V.,* 770 F.Supp. 1053, 1084 (D.Md.1991) (same).[10] Claims for lost profits of course are subject to proof of causation and amount, although in this case such concerns are perhaps less troublesome as a pleading matter because plaintiffs have claimed that during the time period at issue the demand for Honda cars was so high that all dealers could immediately sell any received cars.

The crucial premise of plaintiffs' lost profits claim, however, is the notion that they "should have received" different allocations of cars than they in fact did receive. This is defendants' second, and more compelling, basis for arguing that plaintiffs have failed to allege injury in fact. The parties rely on different lines of cases to attack or support the cognizability of this theory of injury. I conclude that neither side has presented directly controlling case law, but that plaintiffs' claims should not be dismissed because at least some sets of facts would sustain their claims.

Defendants cite cases holding that speculative injuries are not cognizable in RICO. For example, they rely on *In re Taxable Mun. Bond,* 51 F.3d at 518, in which the plaintiffs claimed that a fraudulent scheme deprived them of the opportunity to apply for low-interest subsidized loans and thereby forced them to obtain higher-cost financing. As discussed, a mere "lost opportunity" is not cognizable because it is speculative. The court noted, however, that the very fact that the plaintiffs in that case qualified for alternative (albeit higher-cost) financing *disqualified* them under the terms of the subsidized loan plan. Their claim of injury therefore failed as a matter of internal inconsistency. In this case, defendants have not offered any argument that some overriding factor—e.g., a contractual term, or a Honda corporate policy—in all cases would have precluded all of the plaintiff dealers from receiving *any* allocation of cars greater than they in fact received. Instead, defendants attempt to cast the relevant inquiry differently: they argue that dismissal is appropriate because plaintiffs cannot assert some specific entitlement to a greater allocation than they in fact received.

Plaintiffs respond by relying on a number of cases allowing standing to recover for injuries of an inherently uncertain nature, such as lost profits. For example, plaintiffs rely heavily on *Mid Atlantic Telecom,* 18 F.3d 260, where the Fourth Circuit upheld a phone company's claim for lost profits. In *Mid Atlantic,* it was alleged that the defendant, a long distance telephone service provider, had defrauded its customers by randomly adding minutes to billed calls. The plaintiff, a competing company, claimed that this fraud had allowed the defendant to advertise low rates, forcing the plaintiff to cut its rates as well, costing it profits. The Fourth Circuit held that this pleading represented sufficient injury to confer RICO standing and to allow discovery to proceed, despite the inherently uncertain nature of the claim.

I recognize that this case is different. In addition to the generally uncertain nature of a claim for lost profits, depending as it does on assumptions about past consumer behavior or economic conditions, here plaintiffs' very entitlement to the cars is itself uncertain. Defendants therefore distinguish each of the cases relied on by plaintiffs on the following ground: each of those cases in-

---

**10.** *Mid Atlantic Telecom* and *Mylan Labs.* were decided on proximate causation grounds, but they demonstrate that courts in the Fourth Circuit have considered and allowed claims of injury based on lost profits.

volved a situation where, although the *amount* of the claimed damages may have been somewhat speculative because of the need to reconstruct past events, it could be said with very high probability that the plaintiff was the *only* party who was entitled to recover.[11] In other words, in the two-competitor cases on which plaintiffs rely, misappropriation by one party can be reasonably equated to injury to the other. This case, defendants argue, is not nearly as simple because any given plaintiff dealer must show that it—and not any other bribe-paying dealer nor any other plaintiff dealer—should have received any given misallocated car.

As a matter of ultimate liability, defendants may be correct. It is certainly arguable that plaintiffs cannot recover by simply claiming that bribe-paying dealers as a group received more cars than they should have, and that plaintiff dealers as a group therefore received fewer cars than they should have. Instead, each dealer plaintiff may have to establish some reasonably certain entitlement to cars that were misallocated.[12]

**11.** For example, in *Mid Atlantic Telecom* the plaintiff alleged that some of its *existing* customers had been lured away. Similarly, in *Bieter Co. v. Blomquist*, 987 F.2d 1319 (8th Cir.), *cert. denied*, 510 U.S. 823, 114 S.Ct. 81, 126 L.Ed.2d 50 (1993), the court found a cognizable injury in a developer's claim that it had lost a project to a competitor because of bribes paid to local officials; in that case, however, only two developers had bid on the project—the plaintiff and the allegedly corrupt developer. Finally, in *Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, *modified on other grounds*, 30 F.3d 1347 (11th Cir.1994), the court found a cognizable injury in union members' claims that union negotiators had made concessions in exchange for bribes. Again, in that case, there was no doubt that the conceded advantages would have been retained by the union members absent the alleged misconduct.

**12.** Comparing the *Borman* complaint with the *Trans–Oceanic* complaint illustrates the issues plaintiffs face. In *Trans–Oceanic*, a dealer in Rhode Island (Cardinal Honda) alleges that Honda officials received bribes in exchange for allowing the creation of a competing dealership in Westerly, Rhode Island, just 15 miles from Cardinal's location. Paragraphs 86, 88 and 89 of Cardinal's complaint allege:

Once the Westerly dealership opened in September, 1993, Honda favored the Westerly dealership over Cardinal by allocating more cars and more saleable cars to the Westerly dealership....

This may prove to be a daunting issue of proof for plaintiffs.

At the present time, however, the issue does not merit dismissal of plaintiffs' claims. In *National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) (hereinafter *NOW*), the Supreme Court reviewed the principles governing a motion to dismiss a RICO claim for lack of standing:

We have held that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." ... [Petitioners'] complaint must be sustained if relief could be granted "under any set of facts that could be proved consistent with the allegations."

*Id.* at 256, 114 S.Ct. at 803 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–63, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992) and *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984)). The *NOW* Court accordingly reject-

The Westerly, Rhode Island Dealership competed directly with Cardinal. The Westerly, Rhode Island dealership sold cars and serviced cars that otherwise would have been sold and serviced by Cardinal had Westerly not conspired with Honda in the bribery scheme.

The Westerly dealership opened in late September, 1993. According to financial statements, ... from January 1, 1993 to September 30, 1993, Cardinal sold 444 new Honda cars, 206 used cars, and turned a $369,230 profit. In the nine months from October 1, 1993 until June 30, 1994, after the Westerly, Rhode Island dealership opened, Cardinal sold 374 new cars, 179 used cars, and earned a profit of $203,516.

Taken at face value, this allegation raises a relatively strong inference that cars that were misallocated to Westerly would otherwise have gone to Cardinal.

On the other hand, the *Borman* class alleges that each dealer plaintiff was individually injured by the misallocation of cars to bribe-paying dealers. As illustrated by the *Trans–Oceanic* complaint, a showing of injury may be supported by proof that a given plaintiff dealer was in the same "zone of allocation" as a bribe-paying dealer and that there is some reasonable basis for identifying how may cars were misallocated. In "one plaintiff dealer/one bribe-paying dealer" settings, as is apparently the case with Cardinal, this may be relatively simple. Such a showing will be more difficult, however, where there are multiple plaintiff dealers for every bribe-paying dealer, or where there are multiple bribe-paying dealers.

ed the argument that a RICO claim brought by two health clinics should be dismissed for lack of standing. "[Petitioners] alleged in their complaint that the respondents conspired to use force to induce clinic staff and patients to stop working and obtain medical services elsewhere. Petitioners claimed that this conspiracy 'has injured the business and/or property interests of the [petitioners].' ... Nothing more is needed to confer standing ... at the pleading stage." *Id.,* 510 U.S. at 256, 114 S.Ct. at 803 (citations omitted).

 Defendants' argument that plaintiffs have failed to allege injury is summarized by a single sentence from American Honda's moving papers: "To determine the fact of injury, it is necessary to compare some single, actual history with an invented model of a past which never occurred." Am. Honda's Mot. to Dismiss at 20. At the pleading stage, however, plaintiffs are not required "to determine the fact of injury." To survive a motion to dismiss, there need only be one set of facts consistent with plaintiffs' allegations that would entitle them to relief. Even if defendants are correct that plaintiffs will have some difficulty establishing to which dealer certain cars should have gone, it is clear that some sets of facts could support plaintiffs' claims.

## B. Causation

 In *Holmes,* the Supreme Court held that section 1964(c)'s grant of standing to persons injured "by reason of" a RICO violation "require[s] a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well." 503 U.S. at 268, 112 S.Ct. at 1317. *Holmes* explains that "we use 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." *Id.* Thus, traditional tort law principles of proximate causation apply to RICO cases.

 The Fourth Circuit's decision in *Brandenburg v. Seidel,* 859 F.2d at 1179, remains the leading case describing proximate causation under RICO. As recently reiterated by the Fourth Circuit:

In *Brandenburg* it was recognized that 'the legal cause determination is properly one for the court, taking into consideration such factors as the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection.' .... In conducting the traditional common-law proximate cause analysis ... courts should focus on the temporal and circumstantial relationship between the defendant's conduct and the injury suffered by the plaintiff, and the foreseeability that intervening events would cause injury to the plaintiff.

*Mid Atlantic Telecom,* 18 F.3d at 263 (citations omitted). In addition, the "proximate" cause of an injury need not be the sole cause. "Instead, a factor is a proximate cause if it is a 'substantial factor in the sequence of responsible causation.'" *Cox,* 17 F.3d at 1399 (*quoting Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23–24 (2d Cir.1990)).

Defendants argue that plaintiffs cannot even show *causation in fact,* much less proximate causation. This assertion essentially restates their above-discussed argument that plaintiffs have not pled injury. Because no plaintiff dealer can establish a specific entitlement to a certain allocation of cars, defendants claim, no plaintiff can show that any bribes received by Honda caused harm to any specific plaintiff. Defendants attempt to support this contention in three ways.

 First, defendants argue that because no plaintiff dealer was the intended victim of any of the predicate acts alleged in the complaints, plaintiffs cannot show that their claimed injuries were caused by those acts. Defendants emphasize that any harm caused to plaintiff dealers was an unintentional and indirect result of the bribery scheme. Defendants therefore argue that no plaintiff dealer can claim to have been "defrauded" or otherwise directly duped out of property or money.[13] In response, plaintiffs point out

---

**13.** This position is part of a broader theme that defendants revisit periodically: that American Honda and its corporate parent, not the plaintiff dealers, are the direct victims in this case. Earlier criminal mail fraud indictments have alleged that bribe-taking Honda executives had defrauded *Honda* of its "intangible right of honest services." *See* 18 U.S.C. § 1346. Thus, Honda

that this position has been flatly refuted by the Fourth Circuit: *"Brandenburg* also explained that proximate causation requires a nexus between the proscribed acts and the injuries. We did not, however, intend to establish a rule that only injuries suffered by the immediate victim of a predicate act satisfied the 'by reason of' requirement of § 1964(c)." *Mid Atlantic Telecom,* 18 F.3d at 263. *Mid Atlantic*'s analysis, moreover, is entirely consistent with *Holmes*' holding that proximate cause is all that must be established to sustain a RICO claim.[14]

Second, defendants recite the *Holmes*' Court's discussion of the three considerations that justify a proximate causation requirement as an element of RICO standing: (1) "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation;" (2) "recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts;" and (3) there is no need to grapple with problems (1) and (2) because "directly injured victims can generally be counted on to vindicate the law." 503 U.S. at 269, 112 S.Ct. at 1318. Defendants attempt to characterize these factors as the *Holmes* "test of causation." They then argue that causation is not present here because (1) it will be difficult to ascertain the amount of plaintiffs' damages; (2) it will be difficult to apportion damages among the plaintiffs; and (3) the criminal prosecutions have already "vindicated the law" in this case.

 Plaintiffs correctly respond, however, that the *Holmes*' factors are not themselves a "three part test" of causation. Rather, *Holmes*' causation "test" is that the alleged RICO violation must be a *proximate* cause of the claimed injury (as opposed to a mere cause-in-fact, a less exacting showing not literally precluded by the statute). The

three factors are but the reasons behind the rule, and defendants' argument attempts to turn *Holmes*' holding on its head. If plaintiffs have alleged a sufficiently direct injury resulting from the bribery scheme, they have satisfied the proximate causation requirement, difficulties of quantification and allocation notwithstanding.

Third and finally, defendants place heavy reliance on *Sheperd v. American Honda Motor Co., Inc.,* 822 F.Supp. 625 (N.D.Cal.1993), a case in which a district court dismissed a related RICO complaint against Honda for lack of standing. *Sheperd* was a RICO action brought by the owners of a Honda dealership alleging that their business had been injured by a "turn and earn" scheme involving dealers and Honda executives.[15] The *Sheperd* plaintiffs' claim of injury was that, because they refused to participate in the scheme, their dealership received less desirable allocations of cars and fewer allocations overall. To this extent, *Sheperd* is analogous to this case,[16] and defendants therefore argue that *Sheperd*'s dismissal warrants dismissal here.

As plaintiffs point out, however, *Sheperd* is different from this case in one crucial respect. The plaintiffs in that case alleged injury in "the diversion of popular makes, models, and colors of cars to other dealerships, as well as lower allocations of cars, *which impeded their ability to compete effectively and resulted in the sale of their dealership at a distressed price.*" 822 F.Supp. at 630 (emphasis added). The *Sheperd* court concluded that although there was little doubt that the plaintiffs suffered some harm from the scheme, "a multitude of imaginable factors may have contributed to the diminished profitability of the Sheperds' dealership

---

argues that "[w]hile mail fraud and wire fraud certainly occurred, as is clear from the guilty pleas and convictions of the former American Honda employees, the victim of those acts was American Honda." Am. Honda's Mot. to Dismiss at 30.

**14.** Plaintiffs also argue that they have in fact alleged certain kinds of direct and intended harm; *Borman,* for example, alleges harm in the out-of-pocket costs it paid to participate in the advertising and sales training schemes.

**15.** The "turn and earn" scheme allegedly sought to inflate the number of reported sales by U.S. Honda dealers in order for American Honda to receive higher allocations of cars from Honda's corporate headquarters in Japan. Dealers who inflated their reported sales received better allocations of cars from American Honda.

**16.** That is, rather than seeking the inflated sales reports sought in *Sheperd,* the allegations here are that corrupt Honda executives sought direct bribes of money and property.

and its diminished market value." *Id.* Here, the plaintiffs' claims of "allocation injury" are not based on the downstream results of the bribery scheme.[17] Instead, the plaintiffs' core allegations stop at the claim that the scheme caused the misallocation of cars and that these diversions amounted to the direct denial of profits to plaintiff dealers.

I therefore conclude that plaintiffs' allegations of allocation injury satisfy the proximate causation element required for RICO standing. Assuming plaintiffs' allegations of injury to be true, they have pled an obvious causal connection between their lost profits and the predicate acts constituting the bribery scheme. That plaintiff dealers would be deprived of profits is the direct and foreseeable result of the alleged scheme to give and receive bribes in exchange for higher allocations of cars. *See Mylan Labs.*, 770 F.Supp. at 1084 ("The bribes given and received were allegedly received for the purpose of advancing the bribing company's [interests] at the expense of other companies. . . . Thus, the injury caused those other companies . . . is a foreseeable recognizable result of the predicate actions."). Even if other factors played a role in the allocation of cars, there is no doubt that plaintiffs have alleged that the bribery scheme played a "substantial role" in causing the allocation injuries they claim.

### III.

I next consider the various defendants' motions to dismiss plaintiffs' RICO claims. I will consider the claims against each group of defendants in turn. Three Honda corporate entities—American Honda, Honda North America and Honda Motor Company, Ltd.— are named as RICO defendants in each of the four representative complaints. Ameri-can Honda does not dispute for present purposes that it is subject to respondeat superior liability for the acts of its executives. American Honda instead challenges the sufficiency of plaintiffs' allegations of predicate acts of mail fraud and of the claims under 18 U.S.C. §§ 1962(a), (b), & (d).

Honda Motor Company, Ltd. ("Honda Japan"), the domestic defendants' Japanese corporate parent, first joins in the domestic defendants' arguments. Honda Japan then offers a separate set of arguments that it has no connection to the U.S. activities of American Honda and therefore cannot be held vicariously or directly liable in this case.

A number of current and former Honda dealers are also named as defendants. They echo several of the Honda defendants' positions with respect to standing and pleading sufficiency. They also offer separate arguments for dismissal of the RICO claims.

Finally, the law firm of Lyon & Lyon argues that plaintiffs have failed to adequately allege RICO claims against it based on its role representing American Honda.

### A. American Honda

#### 1. Predicate Acts of Mail Fraud

American Honda argues that the allegations of mail and wire fraud in the complaints are fatally flawed because "plaintiffs do not identify any defrauded party within the proscriptions of the mail fraud and wire fraud statutes." Am. Honda's Mot. to Dismiss at 30 (emphasis omitted). Many other defendants join in this argument. Defendants' underlying point is that the acts of bribery that plaintiffs characterize as mail fraud were not fraudulent at all; because both the bribe-paying dealers and the bribe-taking Honda

---

17. I note, however, that some of the subsidiary claims of injury asserted in the *Breakaway, Austin* and *Trans–Oceanic* complaints do offer such downstream theories. For example, *Breakaway* claims that unfair allocations of cars and the unfair placement of a dealership in close proximity to plaintiffs' dealership caused the value of the Breakaway dealership to decline.

These complaints also seem to allege injury in the very existence of adjacent dealerships that were granted in exchange for bribes. In other words, beyond claiming that a corruptly granted dealership received unfairly high allocations of cars that plaintiff dealers would otherwise have received, these complaints claim injuries for lost market share, pirated sales and other "competitive injuries."

Finally, the *Breakaway* complaint also alleges injury in that it was denied the right to open a new dealership that was instead awarded to a bribe-paying dealer; plaintiff Breakaway alleges that it participated in a purportedly competitive application process that was in fact rigged from the start. Defendant does concede that Breakaway's out-of-pocket costs spent preparing its application are cognizable injuries. However, absent some fixed contractual entitlement to the new dealership, Breakaway's claim that it would have received the dealership absent the bribes would seem to be rather speculative.

executives knew exactly what sort of exchanges they were engaging in, defendants argue, it cannot be said that any party was defrauded of money or property.[18]

■ The federal mail fraud statute, 18 U.S.C. § 1341, provides: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . [uses the mails to further the scheme, shall be guilty of mail fraud]." The elements of mail fraud derived from this definition are clearly established: "(1) the devising of a scheme or artifice either (a) to defraud or (b) for obtaining money by means of false or fraudulent pretenses, representations, or promises, (2) the specific intent to defraud, and (3) the use of the United States mails to execute the scheme." *United States v. Kennedy,* 64 F.3d 1465, 1475 (10th Cir.1995); *see also United States v. Altman,* 48 F.3d 96, 101 (2d Cir.1995). Defendants do not dispute that plaintiffs have adequately alleged use of the mails, nor do they dispute that the bribe-paying dealers and Honda executives knowingly engaged in the scheme. Instead, defendants argue that the bribery scheme was not entered into with an intent *to defraud.*[19]

The Supreme Court has held that "the words 'to defraud' in the mail fraud statute have the 'common understanding' of 'wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane, or overreaching.'" *Carpenter v. United States,* 484 U.S. 19, 27, 108 S.Ct. 316, 321, 98 L.Ed.2d 275 (1987) (quoting *McNally v. United States,* 483 U.S. 350, 358, 107 S.Ct. 2875, 2880–81, 97 L.Ed.2d 292 (1987) (quoting in turn *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924))) (internal quotation marks omitted). Courts have read this language differently in different contexts. Defendants rely heavily on *United States v. Lew,* 875 F.2d 219 (9th Cir.1989), where the Ninth Circuit interpreted this definition to "ma[ke] it clear that the intent [of a "scheme to defraud"] must be to obtain money or property *from the one who is deceived."* *Id.* at 221 (emphasis added). Based on *Lew* and similarly-reasoned cases, defendants assert that, because plaintiffs have not alleged that they gave up money or property in reliance on any representation by defendants, they have failed to allege mail fraud. *See also Mylan Labs.,* 770 F.Supp. at 1073.

Defendants' argument that *Lew* compels dismissal of plaintiffs' claims is not persuasive. In *Lew,* the Ninth Circuit reversed the mail fraud convictions of an attorney who was found to have made misrepresentations to the INS in order to obtain employment certifications for his non-citizen clients. The indictment in that case charged the defendant with defrauding his *clients* out of legal fees, however, and did not allege that he received any money or property from the INS. The court therefore held that no party had been "defrauded" under section 1341— not the INS because it had not paid out money or property, and not the defendant's clients because they had not been deceived.

---

18. Plaintiffs in part respond that they have sufficiently pled various predicate acts that are distinct from the bribery scheme. *Borman,* for example, asserts that various plaintiff dealers paid money based on mailed representations that those sums would go to pay for group dealer advertising, when in fact some money was diverted to corrupt Honda officials. *Austin Motors,* to take another example, points out that defendants have not challenged the allegations of obstruction of justice or tax fraud. Plaintiffs' core allegation of harm, however, is that plaintiff dealers have suffered allocation injury as the result of the bribery scheme, and *Sedima* holds that a civil RICO plaintiff's "compensable injury necessarily is the harm caused by the predicate acts sufficiently related to constitute a pattern." 473 U.S. at 497, 105 S.Ct. at 3285.

19. Several of plaintiffs' memoranda seem to misunderstand defendants to argue that no mail fraud occurred because plaintiffs have not alleged that they specifically relied on any *mailed* representation or statement. Plaintiffs therefore offer citations to a line of cases that clearly establish that a mailing need only be a necessary step in furtherance of a scheme, and need not be fraudulent in and of itself. *E.g., Tabas v. Tabas,* 47 F.3d 1280, 1294 n. 18 (3d Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 2269, 132 L.Ed.2d 275 (1995). Defendants do not attack plaintiffs' mail fraud allegations on this ground, however; instead, defendants argue that, even if plaintiffs were deceived as to the fairness of the allocation system, they did not give up any money or property as a result of that deception.

First, I note that this case involves a different factual setting. Defendants here do not assert a "disconnect" between the target of false statements and the transferor of money or property. Defendants concede in their reply that plaintiff dealers were deceived by Honda's representations that cars would be allocated on a "fair and reasonable" basis. Instead, defendants' real point is (as discussed at length in the previous section on RICO standing) that plaintiffs have suffered no injury from the bribery scheme. From this position follows their conclusion that no "money or property" was given in return, and that therefore no fraud took place.

This argument fails for the same reasons as defendants' contention that plaintiffs lack standing. Plaintiffs have asserted a contractual entitlement to fair and reasonable allocations of cars and have alleged that defendants engaged in a scheme to deprive them of this property right. Taking this claim as true, even *Lew* supports the validity of plaintiffs' mail fraud allegations. The Ninth Circuit noted in *Lew* that the crucial element missing from the government's case was "an intent to obtain money or property from the victim of the deceit." *Lew*, 875 F.2d at 222; *see also United States v. Leon-*

*ard*, 61 F.3d 1181, 1187 (5th Cir.1995) (defining "intent to defraud" as intending "some harm to the property rights of the victim"). Here, plaintiffs have alleged that the purpose of the bribery scheme was to deprive plaintiff dealers of fair allocations of cars in order to enrich bribe-paying dealers, Honda executives and the Honda defendants. They therefore have adequately pled a "scheme to defraud" in violation of section 1341.[20]

I also note that, at best, defendants' argument that an admitted bribery ring—one in which Honda executives took bribes to divert cars from plaintiff dealers to bribe-paying dealers—is not a "scheme to defraud" rests on a technical definition of what it means "to defraud." Although cases such as *Lew* have identified certain categories of conduct beyond the reach of section 1341,[21] in general courts have broadly interpreted the Supreme Court's statement that "the words 'to defraud' commonly refer to wronging one in his property rights by dishonest methods or schemes." *E.g.*, *Altman*, 48 F.3d at 101 (noting that the Supreme Court has long given mail fraud "a broad interpretation, construing it 'to include[ ] everything designed to defraud by representations as to the past or present, or

---

20. Plaintiffs also argue that they have satisfied even a strict "convergence" requirement. They claim that they relied on misrepresentations from Honda (in dealership agreements, for example) that cars would be allocated on a fair and reasonable basis, and that in exchange they paid money in the form of dealership fees and new car purchases, and that they gave up their "contractual rights" by agreeing to, e.g., only distribute Honda cars. The Supreme Court has determined that "property" does include intangible property rights for purposes of section 1341. *Cf. Carpenter*, 484 U.S. at 19, 108 S.Ct. at 317 (finding right to the secrecy of proprietary information within scope of statute).

Although this posits a different theory of property injury than the allocation injuries plaintiffs seek to recover for under section 1964(c), the underlying mail fraud theory is irrelevant for purposes of RICO causation. As discussed in cases such as *Mid Atlantic Telecom*, plaintiffs need only show that the allocation injuries were proximately caused by the bribery scheme, not that they were the immediate result of the predicate acts. Thus, even if plaintiffs' mail fraud theories rely on the fact that they gave up "contractual rights" based on Honda's misrepresentations, plaintiffs can still claim that their alloca-

tion injuries were the proximate result and therefore are remediable under RICO.

21. In particular, a number of cases involve settings, such as the one in *Lew*, in which defendants have made misrepresentations or offered bribes to *government* officials in order to obtain favorable regulatory actions, not to directly obtain money or property from the government. These cases have declined to find "intent to defraud" within the scope of section 1341 in such cases because the mail fraud statute protects money and property interests, not an "intangible right to good government." *See generally McNally*, 483 U.S. at 350, 107 S.Ct. at 2876. In particular, the bribery cases defendants rely on such as *Mylan Laboratories* and *Lancaster Community Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397 (9th Cir.1991), *cert. denied*, 502 U.S. 1094, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992)— cases in which a court found no mail fraud violation when an entity bribed a public agency to obtain a competitive advantage—are distinguishable because the allegedly injured plaintiffs in those cases had no discernable property right to favorable government action. Here, plaintiff dealers have alleged a contractual right to fair allocations of cars.

suggestions and promises ·as to the future' ") (quoting *Durland v. United States,* 161 U.S. 306, 313, 16 S.Ct. 508, 511, 40 L.Ed. 709 (1896)).[22] As stated by the Eighth Circuit, "[t]he crime of mail fraud is broad in scope and its fraudulent aspect is measured by a nontechnical standard, condemning conduct which fails to conform to standards of moral uprightness, fundamental honesty, and fair play." *Atlas Pile Driving Co. v. DiCon Fin. Co.,* 886 F.2d 986, 991 (8th Cir.1989).

### 2. Claims Under Sections 1962(a), 1962(b) and 1962(d)

American Honda finally argues that the complaints fail to properly plead claims under sections 1962(a), 1962(b) and 1962(d). I will consider these claims in turn.

#### a. Section 1962(a)

Section 1962(a) states, in relevant part, "[i]t shall be unlawful for any person who has received any income derived ... from a pattern of racketeering activity ... to use or invest ... any part of such income ... [in] the establishment or operation of ... any enterprise which is engaged in ... interstate or foreign commerce." Most circuits require that section 1962(a) plaintiffs plead "a specific injury to the plaintiff caused by the investment of income into the racketeering enterprise, *distinct from* any injuries caused by the predicate acts of racketeering." *Vemco, Inc. v. Camardella,* 23 F.3d 129, 132 (6th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 579, 130 L.Ed.2d 495 (1994); *see also Ouaknine v. MacFarlane,* 897 F.2d 75, 82 (2d Cir.1990); *Glessner v. Kenny,* 952 F.2d 702, 708–10 (3d Cir.1991); *Parker & Parsley Petroleum v. Dresser Indus.,* 972 F.2d 580, 584 (5th Cir., 1992); *Grider v. Texas Oil & Gas Corp.,* 868 F.2d 1147 (10th Cir.), *cert. denied,*

493 U.S. 820, 110 S.Ct. 76, 107 L.Ed.2d 43 (1989); *Danielsen v. Burnside-Ott Aviation Training Ctr.,* 941 F.2d 1220, 1228–30 (D.C.Cir.1991). Defendants argue that each of the section 1962(a) counts in the complaints should be dismissed for failure to allege such "investment use" injury.

■■■ Plaintiffs initially argue that the Fourth Circuit has declined to adopt the "investment use" injury requirement. *See Busby v. Crown Supply, Inc.,* 896 F.2d 833, 837–38 (4th Cir.1990). *Busby* requires only that a section 1962(a) claim allege injury from the predicate acts that generated income that, in turn, was subsequently "used or invested." Plaintiffs therefore argue that, under *Busby,* their allegations of allocation and other injuries caused by the bribery scheme support their respective claims under section 1962(a). Although I question the soundness of *Busby,* because the Fourth Circuit's interpretation of federal law is binding upon me, I would find that plaintiffs' section 1962(a) claims survive on this basis alone.[23]

■■■ Recognizing that *Busby* is not the prevailing rule, however, plaintiffs also argue that they have sufficiently pled "investment use" injury. Each of the complaints' section 1962(a) counts alleges specific ways in which the domestic Honda defendants received income from the bribery scheme and invested such income in ways that injured plaintiffs. In particular, plaintiffs offer two primary allegations of "use or investment" of racketeering proceeds: (1) that corrupt Honda executives used the bribes and kickbacks they received to obtain ownership interests in existing or new dealerships, and (2) that Honda received income in that it was able to pay its executives substantially less than other manufacturers, and that Honda used this income, directly or indirectly, to finance its

**22.** Courts also have noted that section 1341's prohibition on "schemes to defraud" therefore reaches far beyond narrow common law definitions of fraud. *See Richards v. Combined Ins. Co. of Am.,* 55 F.3d 247, 251 (7th Cir.1995). Similarly, a "scheme to defraud" need not rise to the level of an independent violation of any other state or federal law. *See United States v. Bryan,* 58 F.3d 933, 940 (4th Cir.1995).

**23.** The Fourth Circuit's rule has not been adopted by any other circuit, and *Busby* has been widely and persuasively criticized. *E.g., Nugget Hydroelectric v. Pacific Gas & Elec.,* 981 F.2d 429, 437 (9th Cir.1992) (arguing that clear meaning of section 1964(c)'s "by reason of" language is that plaintiffs must allege injury from violation of section 1962(a), which prohibits use or investment, and not just from element of violation), *cert. denied,* 508 U.S. 908, 113 S.Ct. 2336, 124 L.Ed.2d 247 (1993).

sales and allocation network. Plaintiffs allege that the various injuries already discussed—misallocations of cars, competitive injuries from the unfair placement of nearby bribe-paying dealers, etc.—therefore were caused by Honda's "use or investment" of racketeering income.

Defendants offer two arguments in response. First, defendants argue that the literal injury allegations in the section 1962(a) counts are almost identical to those of the section 1962(c) counts, and that therefore the section 1962(a) allegations must be viewed as failing to allege any distinct injury. *See, e.g., Breakaway* Compl. at ¶¶ 245, 276. Second, defendants note that courts have supplemented the "investment use" injury requirement with the following rule: a plaintiff cannot allege investment injury merely by claiming that subsequent racketeering acts would not have happened but for the use of prior racketeering income to maintain the existence of the enterprise itself. Because a RICO pattern requires at least two predicate acts, allowing plaintiffs to artfully plead such allegations of "reinvestment injury" would effectively allow any section 1962(c) claim also to be brought as a section 1962(a) claim, thereby circumventing the very purpose of the "investment use" injury requirement. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1188–89 (3d Cir.1993).

I find, however, that plaintiffs have alleged "investment use" injury. First, the allegations in the *Borman* and *Austin Motor* complaints that plaintiffs were injured when corrupt Honda executives used bribes and kickbacks to obtain ownership interests in bribe-paying dealerships clearly allege a distinct injury. As the *Borman* plaintiffs argue, "[b]eyond sustaining and perpetuating the conspiracy, the illicit ownership interests resulted in further wrongful diversions of cars. But for the Honda executives' investment of racketeering income in Bribe-paying Dealerships, the Plaintiffs' damages would have been less." *Borman* Opp'n at 39. In other words, plaintiffs allege that these bribe-paying dealerships received particular favoritism *because* they were owned by Honda executives, not just because they paid bribes. This is a distinct allegation of injury caused by the investment of racketeering income.[24]

Moreover, I also find that defendants' "reinvestment" argument—that plaintiffs have not alleged distinct investment injury because the injury allegations in their section 1962(a) and section 1962(c) counts are somewhat circular as to the overall alleged enterprise[25]—misapprehends the purpose of the "investment use" injury pleading requirement. This rule does not force plaintiffs to choose whether to bring a given claim of injury either under section 1962(a) or section 1962(c); instead, it requires allegations under section 1962(a) to be supported by distinct allegations of how the use or investment of illicit income played a causative role. Similarly, the rule against "reinvestment" allegations is not a *per se* rule that the use of proceeds from predicate acts chargeable under section 1962(c) can never support a separate claim under section 1962(a). Instead, this rule requires only that plaintiffs do more than allege that income received from one predicate act was used in the operation of an enterprise and thereby facilitated the commission of later predicate acts. *Cf. Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385, 396 (6th Cir.1989) (holding that injury caused by predicate act of financial fraud could also support claim under section 1962(a) because plaintiffs had alleged that enterprise was itself funded by proceeds illegally obtained from *prior* victims of same fraudulent

---

**24.** Indeed, this is an allegation that perhaps could be construed as a claim that corrupt executives laundered the bribes they received by converting them into profits from ostensibly legitimate dealerships. Courts have noted that section 1962(a) "was primarily directed at halting the investment of racketeering proceeds into legitimate businesses, including the practice of money laundering." *Brittingham v. Mobil Corp.*, 943 F.2d 297, 303 (3d Cir.1991).

**25.** "Circular" in the sense that plaintiffs claim that they suffered "allocation injury" not only from the predicate acts of bribery themselves, but also from Honda's use or investment of bribery proceeds (i.e., amounts saved in executive salaries) to run its nationwide operations so as to cause additional allocation injury. And so on.

scheme), *cert. denied,* 495 U.S. 930, 110 S.Ct. 2169, 109 L.Ed.2d 499 (1990).

These pleading rules do *not,* however, prevent a plaintiff from alleging that the same injuries were caused by violations of both section 1962(a) and section 1962(c). Here, plaintiffs have alleged that Honda (1) received racketeering income by encouraging sales executives to rely on the "supplemental income system;" (2) that Honda invested this income by its financing of its nationwide sales and allocation system; and (3) that plaintiffs suffered various injuries—including allocation injuries, competitive harms and out-of-pocket losses—as the result of the operation of that system. This claim satisfies the pleading requirements of section 1962(a), even to the extent that plaintiffs claim the same kinds of injuries as were caused by the predicate acts themselves. In effect, plaintiffs' section 1962(a) counts represent an alternate theory of liability against the Honda corporate defendants: in addition to asserting violations of section 1962(c) on a theory of *respondeat superior* liability, plaintiffs also allege direct violations of section 1962(a) based on the Honda defendants' use of the income it indirectly received.

### b. Section 1962(b)

18 U.S.C. § 1962(b) makes it "unlawful for any person through a pattern of racketeering activity … to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in … interstate or foreign commerce." Defendants restate their section 1962(a) argument in challenging plaintiffs' claims under section 1962(b): because the plaintiffs have articulated the same claims of injury in each of their RICO counts, they necessarily have failed to plead the "acquisition injury" required under section 1962(b).

 Although section 1962(b) case law is sparse, the clear direction of courts in requiring an "investment use" injury under section 1962(a) indicates that section 1962(b) plaintiffs must plead a specific causal nexus between defendants' acquisition or maintenance of control over an enterprise and claimed injuries. I find that plaintiffs have done so. Plaintiffs have alleged that high-

ranking Honda executives "maintained their control" over Honda's nationwide sales operation by manipulating the allocation and dealership award processes, encouraging zone managers to participate in the "supplemental income system," by directing executives to carry out fraudulent schemes such as the "dealer ad group" campaigns that funneled funds to corrupt officials; and by threatening to demote or fire any Honda whistleblowers. Plaintiffs' claimed injuries directly resulted from these activities. Plaintiffs therefore have properly stated their counts for violation of section 1962(b).

### c. Section 1962(d)

18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." The circuits are split over whether a section 1962(d) claim must allege injury caused by a predicate act of racketeering, *see Miranda v. Ponce Fed. Bank,* 948 F.2d 41 (1st Cir.1991); *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21 (2d Cir.1990); *Bowman v. Western Auto Supply,* 985 F.2d 383 (8th Cir.), *cert. denied,* 508 U.S. 957, 113 S.Ct. 2459, 124 L.Ed.2d 674 (1993); *Reddy v. Litton Indus., Inc.,* 912 F.2d 291 (9th Cir. 1990), *cert. denied,* 502 U.S. 921, 112 S.Ct. 332, 116 L.Ed.2d 272 (1991), or only injury caused by some overt act in furtherance of the conspiracy, *see Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162 (3d Cir.1989); *Gagan v. American Cablevision, Inc.,* 77 F.3d 951 (7th Cir.1996). Defendants' challenge to plaintiffs' section 1962(d) claims implicitly urges for adoption of the rule of the First, Second, Eighth and Ninth Circuits, and then restates the general argument that plaintiffs lack RICO standing: "The conspiracy claims do nothing to overcome the general failure to allege adequately any predicate act directed at plaintiffs that caused any injury to them." Am. Honda's Mot. to Dismiss at 36.

Plaintiffs correctly respond that they have, as discussed above, properly alleged numerous injuries caused by violations of sections 1962(a)-(c). There is no dispute that plaintiffs have alleged that Honda executives conspired to defraud plaintiff dealers

on a nationwide basis. Because I have already determined that plaintiffs have properly pled the underlying claims, I find that plaintiffs have stated a claim under section 1962(d).

### B. Honda Japan

Honda, Ltd., American Honda's Japanese corporate parent, (Honda Japan), both has joined in the arguments in support of the motion to dismiss by the domestic Honda defendants and has filed a separate brief. The major issues separately presented by Honda Japan are: (1) whether plaintiffs have adequately alleged a basis for holding Honda Japan liable through the doctrine of alter ego liability; (2) whether Honda Japan could be held liable vicariously on the basis of the alleged activities of persons who were officers or directors of both American Honda and Honda Japan; and (3) whether plaintiffs have adequately alleged aiding and abetting claims against Honda Japan.

One of the underlying questions with respect to Honda Japan is the extent to which the corporate parent can be held liable for the activities of American Honda and its employees. As I noted earlier, however, each of the complaints attempts to sidestep this issue by referring generically to Honda Ltd., Honda N.A. and American Honda as the "defendant Honda." Plaintiffs of course cannot pierce the corporate veil simply through a pleading device, and I have already directed plaintiffs to replead their complaints to delineate the specific claims against each of the Honda defendants. *See supra* section I.A.

### 1. "Alter Ego" Liability

Honda Japan first challenges plaintiffs' attempt to assert an "alter ego" theory of liability. Defendant argues that "piercing the corporate veil" requires an extraordinary showing that plaintiffs have not alleged and could not possibly prove. Plaintiffs do not dispute defendant's basic legal arguments, but they argue that alter ego liability is a factual issue that is not properly resolved by motion to dismiss.

The corporate form will be disregarded only where upholding it would lead to a patently unjust result. Courts therefore evaluate factors such as (1) the amount of respect given to the separate identity of the subsidiary by the parent; (2) the fraudulent intent of the incorporators; and (3) the degree of injustice that will result if the two companies are treated as separate entities. *See Orloff v. Allman,* 819 F.2d 904, 909 (9th Cir.1987) (listing federal common law factors). Honda Japan agrees that this is a fact-specific inquiry that courts often wait until summary judgment to decide.

There are cases however, as Honda Japan asserts, in which courts have dismissed alter ego claims against corporate parents. In *Resolution Trust Corp. v. Driscoll,* 985 F.2d 44 (1st Cir.1993), the First Circuit affirmed the dismissal of a complaint as to a corporate defendant where the complaint offered only "naked assertions" that the subsidiary was the alter ego of the parent. *Id.* at 48 (noting that complaint "alleges no facts that, if proved, would even arguably permit a court to impose liability ... under an alter ego theory"); *see also Haskell v. Time, Inc.,* 857 F.Supp. 1392, 1403 (E.D.Cal.1994) (dismissing complaint because plaintiff "has failed to allege sufficient facts to warrant piercing the corporate veil"). The *Borman* and *Trans-Oceanic* complaints summarily refer to Honda, Ltd. as the "alter ego" of American Honda and Honda North America several times, but the complaints offer only limited factual allegations related to this assertion: that "[t]he consolidated financial statements of Defendant Honda Ltd. ... treat Defendants American Honda and Honda North America as structurally interlocked affiliates by eliminating inter-corporate accounts and transactions and reflect the fact that the various affiliates ... operate as interrelated departments of Honda Ltd." *Borman* Compl. at ¶ 15; *see also Trans-Oceanic* Compl. at ¶ 3. *Borman* also alleges that high-ranking American Honda executives also were directors of Honda Ltd. *E.g., Borman* Compl. at ¶ 17.

Plaintiffs' allegations are not sufficient to permit them to proceed on a theory of alter ego liability. Their allegation that

the various Honda entities use consolidated financial statements and have interlocking directorates, taken as true, would be insufficient to justify piercing the corporate veil. Moreover, there is no suggestion that American Honda was incorporated for fraudulent purpose, that American Honda is not adequately capitalized, or that any other factor would justify disregarding the corporate separateness of the Honda defendants on equitable grounds. Plaintiffs' allegations that Honda Japan knew about and endorsed the bribery scheme, that Honda Japan benefited from the scheme and that Honda Japan exercised control over American Honda may be relevant to plaintiffs' other theories of liability, but they do not merit piercing the corporate veil.[26]

### 2. Liability Based Upon Activities of Persons Acting in Dual Capacities

■ Plaintiffs allege that certain corrupt executives were acting in their capacities both as officers and directors of American Honda and Honda Japan when they participated in the bribery scheme. Most notably, plaintiffs allege that Koichi Amemiya, who during a relevant time period was both the president of American Honda and a director of Honda Japan, masterminded the scheme. Plaintiffs argue that their allegations are sufficient to establish that Honda Japan is vicariously liable for what occurred.[27] As I have indicated above, the specificity of the complaints are clouded by plaintiffs' use of "defendant Honda" as a pleading device. Nevertheless, I am of the view that plaintiffs have stated claims against Honda Japan.

If what plaintiffs assert is true, Amemiya and others who served American Honda and Honda Japan in dual capacities were fully aware of the bribery scheme and directly participated in it. Honda Japan contends that this is not enough. It points out that plaintiffs' artful pleading reflects that plaintiffs are unable to distinguish between the roles which Amemiya and his fellows were playing. Further, it asks "where was the benefit that we (Honda Japan) were receiving? We simply manufacture vehicles and how they are allocated to dealers is of no consequence to us as long as we are able to sell (as plaintiffs assert we were able to do during the relevant period) all of the vehicles that we produced."

Honda Japan's arguments are not without their force. However, they are essentially

**26.** Plaintiffs also seem to suggest that the "intercorporate agency" between Honda Japan and American Honda is sufficient to impute liability from American Honda to Honda Japan. "Intercorporate agency" can be established for some purposes—service of process, for example—by showing that a subsidiary is completely controlled by the parent, or that a separately incorporated subsidiary is but a conduit for that the parent would otherwise have to do for itself. E.g., Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 419 (9th Cir.1977) (describing required relationship as one of common law agency). Such a showing, however, falls far short of the fraudulent intent/gross inequity showing required to pierce the corporate veil. Because allowing respondeat superior liability on the basis of a purported agency relationship between parent and subsidiary would eviscerate the alter ego doctrine, courts have refused to allow countenance such a theory. E.g., Miller v. Honda Motor Co., Ltd., 779 F.2d 769, 772 (1st Cir. 1985).

**27.** Ordinary principles of vicarious liability apply in RICO cases. See generally Petro–Tech, Inc. v. Western Co., 824 F.2d 1349, 1356–62 (3d Cir. 1987) (reasoning that common law vicarious liability doctrines apply to RICO because they advance statutory goal of facilitating recovery by victims of racketeering). Such liability is most easily established if a corporation benefitted from the acts of racketeering alleged. See Davis v. Mutual Life Ins. Co. of N.Y., 6 F.3d 367, 379–80 (6th Cir.1993), cert. denied, 510 U.S. 1193, 114 S.Ct. 1298, 127 L.Ed.2d 650 (1994). Plaintiffs here claim that Honda Japan was directly benefitted at least by the passing through to it of the benefits accruing to American Honda from the "supplemental income system." Alternatively, plaintiffs rely upon two theories of vicarious liability that do not require benefit to the corporation, apparent authority and ratification. See generally American Soc. of Mechanical Eng'rs v. Hydrolevel Corp., 456 U.S. 556, 566, 102 S.Ct. 1935, 1942–43, 72 L.Ed.2d 330 (1982) (discussing apparent authority); Cox, 17 F.3d at 1409 (ratification).

I also note that because of the manner in which plaintiffs have framed their pleadings against Honda Japan it is unclear whether they are asserting claims for direct liability against it. If they are, several technical and difficult issues are raised, particularly in regard to any claims under sections 1962(a) and (b). I will not consider these issues now but will wait to see if plaintiffs assert direct claims against Honda Japan when they file their amended complaints.

factual in nature. It may be that those who were serving in dual capacities were acting only on behalf of America Honda and not Honda Japan. But it was Honda Japan who chose to structure its management as it did, having its executives cross corporate lines with regular frequency. That alone, of course, will be far from sufficient ultimately to establish Honda Japan's liability. But when it has clothed the top level management of one of its subsidiaries with the appearance of parent-corporation authority, it can hardly ask those not within its inner circle to distinguish between the capacities in which its executives were acting when (as must be assumed to be the fact on a motion to dismiss) they participated in a widespread bribery scheme. Likewise, as to the question of benefit to Honda Japan, plaintiffs at this stage of the litigation cannot specify the precise manner in which the parent corporation may have seen its interests being served by the culture of corruption which its representatives allegedly knew of and actively engendered. It may be, as Honda Japan asserts, that there was no immediate economic incentive for it to participate in the alleged scheme. That question, however, is a fair matter for discovery. And discovery might reveal that Honda Japan blessed the scheme with longer-term goals in mind, goals that would be furthered by having a compromised and compliant dealer network.

 This is a difficult area of the law, one that simultaneously calls for a proper respect for legitimate corporate formalities and a wariness against permitting form to prevail over substance. Generalized and vague pleadings cannot be allowed to circumvent the statutes and common-law rules that protect corporate separateness. Here, however, even recognizing the pleading deficiency in telescoping all of the "Honda defendants" into one, plaintiffs have done more than simply allege that Honda Japan should be held liable for the actions of its American subsidiary and its agents. It has particularized individuals who were closely associated and identified with Honda Japan, who were chosen by it to run a major portion of its worldwide distribution network and who actively participated in what, if plaintiffs' allegations

are accepted to be true, can only be characterized as egregious misconduct.

It is facts, not allegations, that will finally determine the outcome of this litigation. Plaintiffs bear the burden of proving not only the underlying bribes and the damages that they suffered therefrom but also the part played by each of the defendants whom they have named. This will be no easy task. If, however, they produce facts that demonstrate that Honda Japan officials situated in the United States actively were involved in a bribery scheme, that they advised other high-ranking officers and directors of Honda Japan about it and that Honda Japan did nothing to stop the scheme, they will have gone a long way in meeting their burden. They will have gone even further if they can prove that the scheme broadened because of the involvement of executives who were identified with Honda Japan because, for example, dealers were more likely to pay bribes based on their perception that the bribery system was endorsed by the Japanese parent, or that dealers or Honda employees declined to inform anyone about the scheme out of despair or fear of retaliation. And presumably even Honda Japan would concede its liability if plaintiffs could establish that it directed and encouraged the scheme for reasons of its own. These and similar issues must be explored through discovery, and the adequacy of plaintiffs' proof under their various legal theories tested by summary judgment.

### 3. Aiding and Abetting

As a third alternative theory of liability, plaintiffs also assert claims against Honda Japan for aiding and abetting. Honda Japan first argues that the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), which held that section 10(b) of the Securities Exchange Act does not create a private cause of action for aiding and abetting, should be extended to the civil RICO context. In several recent cases that have considered this argument, courts have agreed that *Central Bank of Denver* should be so extended. *E.g., In re Lake States Commodities, Inc.*, 936

F.Supp. 1461, 1472–75 (N.D.Ill.1996); *Department of Economic Dev. v. Arthur Andersen & Co.*, 924 F.Supp. 449, 475–77 (S.D.N.Y. 1996). My holding in *Park v. Jack's Food Sys., Inc.*, 907 F.Supp. 914, 918 (D.Md.1995), notwithstanding, I find the analysis of these cases somewhat persuasive. I need not, however, reach the issue presently. Plaintiffs have adequately alleged other bases of liability, and at least one recent circuit case, as well as a number of other post-*Central Bank of Denver* cases, continue to recognize aiding and abetting liability under RICO. *E.g.*, *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 270 (3d Cir.1995).[28]

### C. Dealer Defendants

Of the many dealer defendants filing motions to dismiss, only three have filed substantive memoranda: the Hendrick defendants, Schuiling defendants[29] and Lustgarten defendants. All of the other dealer defendants filing motions to dismiss join the arguments of at least one of these three. The dealer defendants echo the

Honda defendants' arguments with respect to plaintiffs' standing, the sufficiency of the predicate acts of mail fraud and the adequacy of the *Borman* complaint's allegations against "all defendants." My analysis of these issues set forth above applies equally to the dealer defendants. The dealers also offer several independent challenges to the adequacy of the complaints' claims under sections 1962(a)-(d).

My analysis in this section will focus on the claims against the various individuals and corporate entities associated with the Hendrick Automotive Group (Hendrick), who are named in each of the *Borman*, *Breakaway* and *Austin Motor* complaints. Hendrick allegedly owned more than 25 Honda dealerships during the time period at issue in this case and is allegedly one of the largest dealers to participate in the various bribery schemes. Of the three complaints, *Breakaway* is the primary complaint stating claims specifically against Hendrick.[30] I therefore focus my separate analysis of the claims against the dealer defendants on the *Breaka-*

28. Honda Japan alternatively argues that plaintiffs have failed to adequately plead facts that would support aiding and abetting liability under existing case law. Plaintiffs rely on *Jaguar Cars*, where the Third Circuit stated the elements of aiding and abetting liability: "(1) that the substantive act [i.e., the commission of two or more predicate acts] has been committed, and (2) that the defendant alleged to have aided and abetted the act knew of the commission of the act and acted with intent to facilitate it." 46 F.3d at 270. The first element is not in dispute. As to the second element, the *Jaguar Cars* court noted that "a plaintiff need not offer direct evidence of intent. Rather, the fact finder may infer a defendant's knowledge and intent from circumstantial evidence." *Id.* Plaintiffs argue that the same allegations that support their vicarious liability theories—that Honda Japan officials, including defendant Amemiya, knew about and endorsed the bribery scheme because of the beneficial effects it had on Honda's affairs in the United States—support an inference of intent to facilitate the scheme.

Defendant refers to the Third Circuit's statements of aiding and abetting liability as the "minority view." Defendant also points to two cases finding mere "negative acquiescence" insufficient to prove the intent required for aiding and abetting liability. *See Armco Indus. Credit Corp. v. SLT Warehouse Co.*, 782 F.2d 475, 485–86 (5th Cir.1986); *In re Sahlen & Assocs., Inc. Sec. Litig.*, 773 F.Supp. 342, 368 (S.D.Fla.1991). Here, however, plaintiffs have alleged that Amemiya

and other Honda Japan officials knew about the "supplemental income system," encouraged its widespread use, and personally oversaw some of the fraudulent transactions. *See Borman* Compl. at 97–107. Moreover, in *Cox*, a case on which defendant relies as the proper alternative to the Third Circuit's view, the Eleventh Circuit stated that "[t]he defendant's knowledge may be shown by circumstantial evidence, or by reckless conduct. The same evidence that would support a jury's finding that [defendant] 'knowingly tolerated' [the primary violator's] actions pursuant to the plaintiffs' ratification theory ... will also support a jury's finding that [defendant] was aware of its general role in the scheme." *Cox*, 17 F.3d at 1410. Plaintiffs' allegations would satisfy this test.

29. Plaintiffs have recently reached a final settlement of their claims against the Schuiling defendants that has received Court approval. To the extent any other dealer defendant has relied on Schuiling's motion to dismiss, however, I have considered those arguments in my discussion below.

30. The *Borman* complaint, although purportedly stating claims against "all defendants," focuses its allegations and arguments against the Honda defendants. *Austin Motor* states only one claim against Hendrick—for violation of section 1962(d)—and its pleadings and arguments echo those offered in *Breakaway*.

*way* complaint's allegations against Hendrick. Other plaintiffs are free to amend their complaints in conformance with my discussion below.

█ Hendrick challenges the sufficiency of each of plaintiffs' three substantive RICO violations. With one possible exception,[31] all of the complaints allege the same "enterprise" in their claims against Hendrick:

> Defendant Honda, consisting of Defendants Honda Ltd., Honda North America, and American Honda, constituted an enterprise within the meaning of § 1961(4) of RICO. Defendant Honda was and is an ongoing corporate organization subdivided into a managerial structure with Defendant Honda Ltd. at the top, which wholly owns Defendant Honda North America, which in turn wholly owns Defendant American Honda. At all times stated in this Complaint, Defendant Honda operated as a cohesive continuing unit for the purpose of manufacturing, promoting, distributing and selling Honda and Acura automobiles.

*Breakaway* Compl. at ¶ 379; *see also id.* at ¶¶ 394, 407; *Borman* Compl. at ¶¶ 234, 256. Thus, in its claims under sections 1962(a)-(c), *Breakaway* alleges that Hendrick: (1) "used or invested" racketeering income in the management or operation of the Honda enterprise's activities; (2) "acquired an interest" in Honda; and (3) participated in the conduct of Honda's affairs. I conclude that, even if true, the payment of bribes to obtain influence over an enterprise's activities falls short of "investing in" or "acquiring an interest in" the enterprise. However, as clearly stated in controlling case law, payment of bribes is sufficient to "participate in the conduct" of the enterprise.

*1. Sections 1962(a) & (b)*

Plaintiffs' section 1962(a) and 1962(b) allegations are for the most part identical. As

an initial matter, plaintiffs have adequately alleged that Hendrick "received income" from racketeering activity. For example, they allege that Hendrick received extra profits on cars misallocated on the basis of bribes and kickbacks. Plaintiffs then claim that Hendrick "used or invested" this income "by paying bribes to Defendant Honda employees to obtain more LOIs [i.e., "Letters of Intent" for new dealerships], dealerships and cars from Defendant Honda." *Breakaway* Compl. at 385. The complaint then adds that Hendrick "used and invested this income in the 'supplemental income system' at Defendant Honda for Defendant Honda executives." *Id.* at 386. Plaintiffs' section 1962(b) claims against Hendrick repeat this "indirect investment" allegation: plaintiffs claim that Hendrick "maintained a direct and indirect interest in and control of the RICO enterprise of Defendant Honda" by "bribing Defendant Honda executives and employees." *Breakaway* Compl. at 398. Plaintiffs claim that by paying bribes, Hendrick "manipulated the system for awarding dealerships and allocating cars, and thus maintained direct and indirect control over the enterprise of Defendant Honda." *Id.* In other words, plaintiffs characterize Hendrick's payment of bribes as an "investment" intended to obtain partial control over Honda's allocation and dealership award activities.

█ Defendant dealers argue that paying bribes to obtain influence over allocation decisions does not constitute "investing" or "acquiring or maintaining an interest" in the Honda enterprise. Defendants rely on *Moffatt Enters., Inc. v. Borden, Inc.*, 763 F.Supp. 143 (W.D.Pa.1990), one of the few cases to extensively consider the meaning of "invest" or "control" in this context. The *Moffatt* court, after noting that section 1961 does not define "control," first turned to the language of section 1962(a), which offers an exception

**31.** The exception is the *Borman* complaints' section 1962(c) allegation of an enterprise consisting of the "Honda Dealer Network," consisting of the corporate entities and individuals who owned Honda and Acura dealerships. *Borman* Compl. at ¶¶ 270–73. Borman alleges that the Honda Dealer Network is both a formal entity and an association in fact. It is clear that any

dealer defendant subject to such a claim could be said to have "participated in the conduct of the affairs of" this enterprise. As described *supra* section I.A, however, the *Borman* complaint's counts 1–4 cannot properly be construed as stating claims against Hendrick (or any other defendant aside from the three Honda entities).

to that provision's prohibition on "investing" the proceeds of racketeering:

> "A purchase of securities on the open market for purposes of investment, and without the intention of *controlling* or participating in the *control* of the issuer ... shall not be unlawful under this subsection if the securities ... do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer ... the power to elect one or more directors of the issuer."

*Id.* at 143 (quoting section 1962(a)). Thus, section 1962(a) uses "control" to refer to a proprietary interest in an enterprise, and not simply some degree of influence over the enterprise's affairs. *Moffatt* reasons that the same meaning should be used for purposes of section 1962(b), absent express congressional intent to the contrary.

*Moffatt* then describes how RICO's legislative history in fact confirms that the two subsections are to be read together.

> Subsection (b) prohibits acquisition or maintenance of an enterprise through the proscribed pattern of racketeering activity or collection of unlawful debt. There is no 1 percent limitation here as in subsection (a) because (a) focuses on legitimate acquisition with illegitimate funds. Subsection (b) focuses on illegitimate acquisition with illegitimate funds.... Consequently, any acquisition meeting the test of subsection (b) is prohibited without exception.

*Id.* (quoting H.R.Rep. No 1549, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 4007, 4033). *Moffatt* therefore concludes that "the 'interest' contemplated in both sections 1962(a) and 1962(b) is in the nature of a proprietary one, such as the acquisition of stock, and that the 'control' contemplated is in the nature of the control one gains through the acquisition of sufficient stock to affect the composition of a board of directors." *Id.* The opinion carefully notes, however, that it is not purporting to announce a *per se* rule that section 1962(b) applies only to acquiring stock or controlling directors. Instead, it holds that actions cognizable under section 1962(b) must be "in the nature" of these activities.

Defendants argue that plaintiffs' allegation that paying bribes constituted "investing" or "acquiring an interest" in Honda is not in the nature of obtaining such a proprietary interest. I agree.[32] I therefore adopt *Moffatt*'s reasoning that sections 1962(a) and (b) properly apply to activities in the nature of acquiring a proprietary stake in an enterprise, not simply obtaining some influence over discretionary activities. *See also NCNB Nat'l Bank v. Tiller*, 814 F.2d 931, 936 (4th Cir.1987) (affirming dismissal of section 1962(b) claim alleging that secured lender "controlled" a borrower, stating that "[a]ctual day to day involvement in management and operation of the borrower" would be required to state a claim under section 1962(b)). Plaintiffs' allegations that Hendrick paid bribes as investments or to obtain control over Honda's allocation activities fails to meet this standard. Plaintiffs' section 1962(a) and 1962(b) claims against Hendrick accordingly are dismissed, although plaintiffs are granted leave to replead these counts.[33]

---

32. Plaintiffs argue in opposition that the language of section 1962(b) broadly refers to "acquiring, directly or *indirectly*, any interest or control" in an enterprise, and that the provisions of RICO are to be construed liberally. *See generally United States v. Vogt*, 910 F.2d 1184, 1194 (4th Cir.1990), *cert. denied*, 498 U.S. 1083, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991). In light of *Moffatt*'s persuasive analysis, plaintiffs' general reliance on liberal construction principles is insufficient.

33. As suggested by my discussion of plaintiffs' section 1962(a) claims against American Honda, plaintiffs could replead valid section 1962(a) claims against the dealer defendants by alleging an enterprise—such as a dealer network—in which they could be found to have "invested." For example, a claim against a dealer who allegedly used profits from misallocated cars to obtain a new dealership that won customers away from a plaintiff dealer could satisfy section 1962(a). Alternatively, an allegation that a dealer used illicit profits to fund his existing dealership's efforts to woo additional customers (by, for example, launching a legitimate advertising campaign using extra profits obtained from misallocated cars) could also state a claim under section 1962(a). Of course, as discussed *supra* note 16, such theories would run into the possibly insurmountable problem of proving such "competitive harm" to a reasonably certain degree.

### 2. Section 1962(c)

Hendrick next argues that plaintiffs have failed to allege that Hendrick "participated in the conduct" of the Honda enterprise. Hendrick relies on *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). In *Reves,* the Court held that " 'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' [as required by] § 1962(c), one must participate in the operation or management of the enterprise itself." *Id.* at 185, 113 S.Ct. at 1173. This "operation or management" test does limit section 1962(c) liability to those playing "*some* part in directing the enterprise's affairs." *Id.* at 179, 113 S.Ct. at 1170. Defendant argues that plaintiffs' "control through bribery" allegation fails to satisfy the "operation or management" test of *Reves.*[34]

Plaintiffs do allege that Hendrick, a major bribe-paying dealer, paid bribes not only to receive specific reciprocal benefits, but also to obtain a general degree of influence over Honda executives.[35] Moreover, the *Reves* Court noted that the operation or management test does not necessarily limit section 1962(c) liability to an enterprise's "insiders." Specifically, the Court stated that "[a]n enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery." *Id.* at 184, 113 S.Ct. at 1173. This case, as alleged, falls squarely within this example. I therefore find that plaintiffs have stated a claim under section 1962(c).

### 3. Section 1962(d)

■ The parties' arguments with respect to the RICO conspiracy count address familiar issues of conspiracy liability. The parties do not dispute that plaintiffs have pled the elements of a section 1962(d) claim: the dealer defendants allegedly committed predicate acts of mail fraud in furtherance of their agreements with various specific bribe-taking Honda executives. The only disputed issue is whether plaintiffs have properly pled facts supporting the scope of the conspiracy they allege. Plaintiffs allege a "global" conspiracy: that "[Hendrick] conspired with Defendant Honda and certain other bribe-paying Honda and Acura dealers, some of whom are named above and others whom are yet unknown to Plaintiffs ... to violate RICO § 1962(a), (b) and (c)." *Breakaway* Compl. at ¶ 420; *see also Borman* Compl. at 385; *Austin Motor* Compl. at ¶ 220.

Hendrick argues that plaintiffs have not alleged that any of the dealer defendants communicated with each other in connection with the alleged schemes, nor that Hendrick had any knowledge of or an intent to further a global conspiracy to defraud plaintiff dealers as a group. Hendrick thus invokes the familiar "hub and spoke" conspiracy analysis: although there is no question that plaintiffs have alleged the existence of a "hub" (i.e., Honda) and of "spokes" (i.e., the individual conspiracies between specific bribe-paying dealers and Honda), plaintiffs have alleged no facts supporting the existence of a "rim" to the conspiracy (i.e., communication among the various bribe-paying dealers). Plaintiffs' main response is that specific facts indicating a "rim" to the conspiracy are not necessary because they have pled that Hendrick knew about the scope of the global conspiracy and intended to further it. Plaintiffs' contention really amounts to a claim that Hendrick, allegedly a major bribe-paying dealer, must have known about the conspiracy because it was so widespread. *See generally Kotteakos v. United States,* 328 U.S. 750, 752–55, 66 S.Ct. 1239, 1241–43, 90 L.Ed. 1557 (1946); *Blumenthal v. United States,* 332 U.S. 539, 556–58, 68 S.Ct. 248, 256–57, 92 L.Ed. 154 (1947).

---

**34.** Hendrick also argues that the "control through bribery" allegation is inconsistent with other allegations that Honda executives engaged in extortion by threatening some dealers with *low* allocations if they *did not* pay bribes. Plaintiffs have alleged, however, that dealers such as Hendrick willingly participated in order to manipulate the dealer allocation system.

**35.** I note that this allegation is offered only at a general level in the complaints. It was discussed more clearly at oral argument and in plaintiffs' opposition memoranda. Plaintiffs should amend their complaints to more specifically outline these claims.

Although plaintiffs' allegations may be somewhat conclusory, Hendrick's motion to dismiss the section 1962(d) claim will be denied. As I described at the May 3 hearing, the underlying concern of the dealer defendants with respect to the section 1962(d) claims is whether there is a possibility they may be exposed to liability for all of the damages allegedly caused by a nationwide, "global" conspiracy. That is an issue that need not be resolved at the pleading stage. As drafted, plaintiffs' claims sufficiently allege a global conspiracy. As with a number of other issues in this case, however, after the completion of discovery plaintiffs will be required to point to specific facts indicating some knowledge of a global conspiracy on the part of dealer defendants in order to sustain their section 1962(d) claims as alleged.

### 4. Miscellaneous Issues

The remaining group of dealer defendants filing separate memoranda are the individuals named in their capacities as executors of the estate of Martin Lustgarten, an alleged bribe-paying dealer who died in 1989 (Lustgarten). Lustgarten is named only in the Borman complaint.

Lustgarten argues that plaintiffs failed to comply with Pennsylvania probate requirements and therefore cannot assert claims against Martin Lustgarten's estate.[36] Plaintiffs filed their claims against the Lustgarten estate by serving one executor, Raymond Hovsepian, in 1995. The Lustgarten defendants argue that plaintiffs' claims against the estate are deficient for two reasons: (1) under Pennsylvania law, all executors must be jointly sued to state a claim against an estate, see 21 Standard Pa.Practice 2d § 115:28; Gram v. May, 41 F.R.D. 52 (E.D.Pa.1966), and (2) under Pennsylvania

probate procedures, any claims not presented at the final "audit" of an account are barred, see 20 Pa.Cons.Stat. §§ 3386–89.

Plaintiffs respond that they should not be penalized (1) for serving the only executor reasonably known to them at the time of filing, or (2) for failing to act on notice of a probate proceeding published only in a local newspaper. Putting aside the procedural sufficiency of plaintiffs' service on the estate, I find that defendants are correct that plaintiffs' claims against the estate are time-barred. In Tulsa Professional Collection Servs. v. Pope, 485 U.S. 478, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988), the Court held that state probate nonclaim statutes can extinguish rights of action as long as due process minimums are met. Id. at 489–91, 108 S.Ct. at 1347–48. The Pope Court also noted that "[f]or creditors who are not 'reasonably ascertainable,' publication notice can suffice." Id. at 490, 108 S.Ct. at 1347.[37]

In any event, plaintiffs seem to concede that Lustgarten's estate is not the proper party. In their opposition, plaintiffs state that "[t]he Lustgarten Executors have ignored the Borman Plaintiffs' allegation that it was Lustgarten's entities through which bribes and kickbacks flowed to various Honda agents. The Lustgarten Dealerships, which are not 'deceased', conducted Lustgarten's business affairs and acted, for all practical purposes, as conduits for Lustgarten's bribe-paying activity. Plaintiffs have requested leave to add those entities as defendants once they are identified." Such leave is granted.

### D. Lyon & Lyon

Roland Smoot, a partner in the California-based law firm of Lyon & Lyon, served on

---

**36.** Lustgarten also argues that plaintiffs' civil RICO claims are punitive in nature and therefore do not survive the death of Martin Lustgarten. "Courts that have considered the question of claim survival in the context of civil RICO have adopted a common law rule that remedial claims survive while punitive claims abate upon the death of the defendant." Confederation Life Ins. Co. v. Goodman, 842 F.Supp. 836, 837 (E.D.Pa. 1994). In one of the few reported decisions addressing this issue, the Fourth Circuit has held that "we think that civil RICO claims should survive. Certainly, the primary purpose of the

private right of action created by RICO is remedial." Faircloth v. Finesod, 938 F.2d 513, 518 (4th Cir.1991).

**37.** In any event, the sufficiency of the publication notice in Lustgarten's probate proceedings is not really at issue. According to plaintiffs themselves, they could not even have asserted a claim in 1989; they contend for statute of limitations purposes that they did not become aware of the facts in this case until years later.

the board of directors of American Honda during the time period at issue in this case. The firm served as American Honda's general counsel. Lyon & Lyon also allegedly oversaw American Honda's conflict of interest policies (related to, for example, the receipt of gifts and favors by Honda employees from dealers) and advised various American Honda executives during the criminal investigations in the early 1990's. Plaintiffs' basic allegations against Lyon & Lyon are that it helped perpetuate the bribery scheme throughout the 1980's and committed acts of obstruction of justice during the criminal investigations.

Lyon & Lyon and Smoot are named as defendants in the *Borman* and *Austin Motors* complaints. *Borman* asserts violations of sections 1962(c) and (d); *Austin Motors* brings a claim under section 1962(d) that is effectively the same as *Borman*'s count under that section. I evaluate these counts below. I find that, as currently alleged, these claims are insufficient. Because they may be properly restated, however, plaintiffs are granted leave to amend.

### 1. *Section 1962(c)*

Plaintiffs offer the following section 1962(c) allegations: (1) that there was an enterprise consisting of the association of the three Honda entities; (2) that Lyon & Lyon "participated in the conduct" of the Honda enterprise's affairs because Lyon & Lyon attorneys held management positions with American Honda, covered up reports of bribe-taking and conflicts of interest by executives and advised Honda executives to withhold information during the criminal investigation; and (3) that defendants engaged in a pattern of activity by committing predicate acts of obstruction of justice, witness tampering and mail fraud. Plaintiffs allege that defendants knew about the bribery scheme, played a central role within Honda to further the scheme by "keeping the lid" on complaints from non-bribe-paying dealers and then carried out a cover-up that prolonged the scheme's duration.

### a. *"Participation" by Lyon & Lyon*

Defendants first argue that they did not "participate in the conduct of" Honda's affairs. They rely on *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), where the Court held that an outside accounting firm could not be liable under section 1962(c) because it did not "operate or manage" the enterprise. Lyon & Lyon's basic contention is that it was an outside professional adviser with no authority to stop the scheme. In response, plaintiffs argue that they have alleged that Smoot served on Honda's board of directors, that several Lyon & Lyon partners received salaries from Honda apart from any fees for professional services, that Lyon & Lyon attorneys knew about the scheme and acted to further it, and that Lyon & Lyon had management-like responsibility for overseeing Honda's activities with respect to conflicts of interest and other dealer relations issues.

Defendants cite several post-*Reves* cases finding that somewhat similar allegations against attorneys fail to constitute "operation or management" of the enterprise. In *Bowdoin Constr. Corp. v. Rhode Island Hosp. Trust Nat'l Bank,* 869 F.Supp. 1004, 1009 (D.Mass.1994), the court found insufficient an allegation that "with full knowledge of the fraud being perpetrated, the law firms counseled their respective clients to continue to participate in the fraudulent transactions and to keep them hidden from the victims of the fraud." *Id.* at 1009; *see also Biofeedtrac v. Kolinor Optical Enters.,* 832 F.Supp. 585, 591 (E.D.N.Y.1993) (noting that "[c]orporate counsel customarily [serve as corporate directors or officers] without becoming a part of the operation or management of the enterprise").[38] Plaintiffs, on the other hand, point to cases upholding section 1962(c) allegations against professionals acting to further a fraudulent scheme. *See, e.g., Clark v. Milam,* 847 F.Supp. 409, 417 (S.D.W.Va.1994) (declining to dismiss allegation that accountants "knowingly concealed the activity of

---

**38.** I note, however, that in *Biofeedtrac* the attorney-defendant's directorship was more in the nature of a transactional formality; he had no vote as a shareholder and had no employment con-

tract. Here, plaintiffs have alleged that Smoot was a full-fledged director of American Honda, with full voting power and a monthly salary.

other defendants who exercised day-to-day control over the enterprise. The concealment of the other defendants' conduct is alleged to have been integral to the continuing operation of the RICO enterprise.").

■ These cases reveal an underlying distinction between acting in an advisory professional capacity (even if in a knowingly fraudulent way) and acting as a direct participant in corporate affairs. *E.g., Bowdoin Constr.*, 869 F.Supp. at 1009 (noting that firm only *"counseled"* clients to continue fraud) (emphasis added); *Biofeedtrac*, 832 F.Supp. at 591 (noting that attorney-defendant's "role was confined, at all times, to providing legal advice and legal services" and "[a]t no time does he appear to participate in or even offer an opinion regarding a business point"); *see also Department of Economic Dev.*, 924 F.Supp. at 465–69. Here, plaintiffs have alleged that Lyon & Lyon attorneys played a direct management role "with respect to policy and procedure for handling" the bribery scheme, *Borman* Compl. at ¶ 297, in particular to the extent plaintiffs claim that Lyon & Lyon attorneys fielded complaints from non-bribe paying dealers, handled Honda's internal investigations and assisted in covering up the scheme. Plaintiffs also allege that Smoot and other Lyon & Lyon attorneys were paid directors with a full voice on American Honda.

I find that allegations of this kind do assert "participation" in the Honda enterprise. Unfortunately, as drafted, the current complaints do not offer sufficiently specific allegations to put Lyon & Lyon on notice as to precisely how it allegedly played such a direct role; much of my above discussion derives from plaintiffs' opposition memoranda and oral argument. Plaintiffs are accordingly directed to amend their complaints.

### b. Pattern Requirement

Lyon & Lyon's second argument under section 1962(c) is that plaintiffs have failed to allege a "pattern" of racketeering. Obviously, that argument is mooted if plaintiffs properly replead to allege Lyon & Lyon's direct role in the bribery scheme as discussed above. In that event plaintiffs' present allegations that between 1990 and 1992 various Honda executives committed perjury or otherwise obstructed criminal investigations on the advice of Lyon & Lyon will simply supplement its allegations concerning Lyon & Lyon's earlier involvement.[39] If, on the other hand, plaintiffs conclude that they cannot properly allege facts sufficient to support their presently conclusory averment regarding Lyon & Lyon's direct participation, but that they can properly allege facts to support an averment of Lyon & Lyon's direct management of a coverup in the later years, I will then consider the issues raised by this more limited theory.

### 2. Section 1962(d)

The elements of a claim under section 1962(d) traditionally have been stated to be: (1) knowledge of the general nature of the conspiracy; (2) agreement by the defendant: (a) to personally commit a violation of sections 1962(a)–(c); (b) to aid or abet a violation; or (c) that another co-conspirator commit a violation; and (3) injury caused by an act in furtherance of the conspiracy. *See United States v. Pryba*, 900 F.2d 748, 760 (4th Cir.), *cert. denied*, 498 U.S. 924, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990). To the extent that this formulation refers to aiding and abetting a substantive RICO violation, it will have to be reconstituted, at least as to outside advisors, in the event that courts adopt what appears to be the emerging rule in post-*Reves* and post-*Central Bank of Denver* cases. Indeed, courts eventually will have to analyze more closely than they have thus far the inter-relationship between *Reves* and section 1962(d) claims in the outside advisor context.[40] Again, however, resolution

---

**39.** I note, however, that based upon the information contained in the parties' memoranda, it appears that at least some of the activities that plaintiffs have characterized as "obstruction of justice" may have been an entirely proper course of legal representation.

**40.** What I mean by this is that under traditional conspiracy theory it appears clear that an outside advisor who intentionally lent her services to an illegal scheme knowing of its purpose could be held criminally culpable and civilly liable for the conspiracy. This would include, for example, an attorney who, without any direct participation, knowingly advised her client to prepare false

of these issues can await another day. If plaintiffs' amended complaints allege Lyon & Lyon's direct involvement in the affairs of Honda with regard to the bribery scheme, that will suffice for section 1962(d) purposes just as it will under section 1962(c).

## IV.

Plaintiffs assert claims under two antitrust statutes: (1) The Sherman Act, 15 U.S.C. § 1,[41] and (2) the Robinson–Patman Act, 15 U.S.C. § 13(c). Each will be addressed in turn.[42]

### A. Sherman Act Claims

■■■ Section 1 of the Sherman Act provides: *"Every* contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce among the several states . . . is declared to be illegal."

materials for public distribution to further a scheme to defraud—the type of conduct which post-*Reves* is not within the scope of section 1962(c).

Of course, section 1962(d) cases could be treated differently from those arising under section 1962(c) on the very ground that different subsections of the statute are involved. Such technical distinctions abound in decisions interpreting other RICO provisions, particularly with regard to the differences between sections 1962(a) and (b) and section 1962(c). Perhaps for that reason several post-*Reves* opinions upholding criminal convictions of advisors under section 1962(d) have not seemed to be very troubled by the issue. *E.g., MCM Partners v. Andrews–Bartlett & Assoc.,* 62 F.3d 967, 979–80 (7th Cir.1995). However, *to permit advisors, particularly outside professionals, to be held liable in civil RICO cases under a section 1962(d) theory when, in the wake of Reves,* a section 1962(c) claim could not be maintained against them would seem to eviscerate the Supreme Court's apparent purpose of permitting outside professionals to extricate themselves from RICO actions by way of a motion to dismiss or for summary judgment. If, as is true under conventional conspiracy analysis, knowledge and intent are the critical issues to be decided, only rarely could such motions be granted.

The Third Circuit focused more closely upon these concerns than have other courts in *United States v. Antar,* 53 F.3d 568, 580–81 (3d Cir. 1995). However, the distinction which the court drew between "conspiring to operate or manage an enterprise," on the one hand, and "conspiring with someone who is operating and managing the enterprise," on the other, while appealing on its face and sensible in the context of the facts

(emphasis added). The Supreme Court has long since interpreted the statute as applying only to those restraints that unreasonably restrain trade and competition. *See Standard Oil Co. v. United States,* 221 U.S. 1, 58–61, 31 S.Ct. 502, 515–16, 55 L.Ed. 619 (1911). Unlike section 2 of the Sherman Act, a violation of section 1 requires a showing of concerted action or an agreement between two or more persons to restrain trade. *See, e.g., R.D. Imports Ryno Indus., Inc. v. Mazda Distrib., Inc.,* 807 F.2d 1222, 1224 (5th Cir.), *cert. denied,* 484 U.S. 818, 108 S.Ct. 75, 98 L.Ed.2d 38 (1987). The elements that generally establish a section 1 violation include: (1) joint or concerted action, (2) that unreasonably restrains trade, (3) in interstate commerce. *Id.*

■■■■ While most restraints require elaborate inquiry under the rule of reason,[43]

which the court was addressing, may prove difficult to apply in practice.

**41.** While the plaintiffs originally asserted Sherman Act claims under sections 1 and 2, they have since consented to the dismissal of their section 2 claims. They also have consented to the dismissal of their rule of reason claims under section 1 as well as their *per se* theory alleging resale price maintenance. Remaining for consideration, therefore, is their *per se* claim under section 1 resting on a "group boycott" theory.

**42.** While Honda Japan argues separately that the antitrust claims should be dismissed at least as to it, the vicarious liability principles outlined in my discussion of plaintiffs' RICO claims against Honda Japan, *see supra* section III.B, also apply to the plaintiffs' antitrust claims. *See generally American Soc'y of Mechanical Eng'rs,* 456 U.S. at 565–76, 102 S.Ct. at 1942–48 (principles of agency and vicarious liability apply to antitrust claims); *see also Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1373 (3rd Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

**43.** Under the rule of reason, "the fact finder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). Inquiry must be made into the relevant product and geographic markets to determine the effects of the restraint on competitive forces. The rule of reason inquiry is fact-intensive and generally requires elaborate analysis of the relevant market, the ultimate test being whether the restraint harms competi-

the Supreme Court has recognized that "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable....", *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Such *"per se"* rules evolved out of the need for business certainty and litigation efficiency. *Arizona v. Maricopa County Medical Soc'y,* 457 U.S. 332, 344, 102 S.Ct. 2466, 2473, 73 L.Ed.2d 48 (1982). Certain categories of restraints are so inherently and facially anticompetitive that elaborate inquiry into the competitive effects on the relevant market is not required. *Northern Pacific Ry.,* 356 U.S. at 5, 78 S.Ct. at 518. Those categories of restraints that have traditionally received *per se* treatment include horizontal price fixing, vertical resale price maintenance, group boycotts, and territorial allocations. *See, e.g., George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547, 559 (1st Cir.1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975). Whether to apply a *per se* rule or the rule of reason is a question of law. *See Gregoris Motors v. Nissan Motor Corp., U.S.A.,* 630 F.Supp. 902, 906 (E.D.N.Y.1986).

Plaintiffs attempt to invoke the *per se* rule by classifying the bribery scheme as a "group boycott." In their representative complaints, plaintiffs allege that the bribery scheme was illegal since it acted as a horizontal agreement among the defendants and co-conspirators giving favorable allocations to defendant dealers. *See* Borman Compl. ¶ 329; Breakaway Compl. ¶ 304; Austin Compl. ¶ 236. As a result, plaintiffs were excluded from access to products and competition on an equal basis. Determining whether concerted action qualifies as a group boycott, thus meriting *per se* treatment, has historically been the most difficult issue facing courts in the context of the *per se* rule. As the Supreme Court noted: "[T]here is more confusion about the scope and operation of the *per se* rule against group boycotts than in reference to any other aspect of the *per se* doctrine." *Northwest Wholesale Sta-*

*tioners v. Pacific Stationery,* 472 U.S. 284, 294, 105 S.Ct. 2613, 2619, 86 L.Ed.2d 202 (1985) (citing L. Sullivan, *Law of Antitrust* 229–30 (1977)).

The Supreme Court has cautioned against application of the *per se* rule by pigeonholing certain conduct as a group boycott. *Id.* (noting that types of conduct that fall within category of group boycotts is far from certain and thus courts must use great care); *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 458, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986) ("[W]e decline to resolve this case by forcing the Federation's policy into the 'boycott' pigeonhole and invoking the *per se* rule."). The Court noted in *Indiana Federation of Dentists:*

> The category of restraints classed as group boycotts is not to be expanded indiscriminately, and the *per se* approach has generally been limited to cases in which firms with market power [at the same level of distribution] boycott suppliers or customers in order to discourage them from doing business with a competitor.

476 U.S. at 458, 106 S.Ct. at 2017–18. If the economic impact of a certain business practice is not immediately obvious, the *per se* rule should not be used by classifying the conduct as a group boycott. *Id.* at 458–59, 106 S.Ct. at 2017–18. "The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive." *Northwest Wholesale Stationers,* 472 U.S. at 298, 105 S.Ct. at 2621.

Some courts have used the phrase "classic group boycotts" to describe the type of boycotts obviously anticompetitive and thus deserving of *per se* treatment. "Classic" boycotts essentially have two characteristics. First, they involve horizontal agreements among competitors at the same level of distribution refusing to deal with suppliers or customers who deal with their competitors. *See, e.g., Weiss v. York Hosp.,* 745 F.2d 786, 819 (3rd Cir.1984) ("classic example" of group boycott when businesses at one level of

---

tion, not whether it hurts competitors. *See, e.g., Cemar, Inc. v. Nissan Motor Corp., U.S.A.,* 678 F.Supp. 1091, 1098 (D.Del.1988) (citing *Bruns-*

*wick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)).

distribution agree among themselves not to deal with manufacturer who deals with their competitor), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985). Second, they involve anticompetitive purpose or animus; that is, the specific purpose behind the restraint is to exclude competitors and to quell price competition. *See Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367, 374 (3rd Cir.1985); *Commonwealth of Pa. v. PepsiCo, Inc.*, 836 F.2d 173, 183 (3rd Cir. 1988); *Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.*, 810 F.2d 869, 877 & n. 8 (9th Cir.1987); *Kreuzer v. American Academy of Periodontology*, 735 F.2d 1479, 1491 (D.C.Cir.1984).

■ Plaintiffs in this case have failed to allege facts that demonstrate a classic group boycott by the Honda defendants and the defendant dealers. First, despite their conclusory allegations that the bribery scheme was a horizontal restraint, the agreements between individual defendant dealers and the Honda defendants were vertical in nature. Honda is a manufacturer and the defendant dealers act as distributors. Plaintiffs make no allegation that the dealers conspired among themselves to exclude the plaintiffs from competition. Second, they have failed to adequately allege anticompetitive purpose. Indeed, the facts alleged demonstrate that Honda executives participated in the scheme in order to receive supplemental income in the form of bribes. The defendant dealers wanted more favorable allocations, in both numbers and "mix," in order to reap extra profits. *See, e.g., Borman* Compl. ¶ 137. While it is true that the defendant dealers allegedly intended to injure the plaintiffs through the bribery scheme, the complaints make clear that they intended to do so only to the extent they would receive extra profits from misallocated cars rather than the plaintiffs. *See id.*

Plaintiffs contend that the bribery scheme was a horizontal restraint, and thus deserves *per se* treatment, since the anticompetitive *effects* were horizontal in nature. Both *Borman* and *Breakaway* rely heavily on *Com-Tel, Inc. v. DuKane Corp.*, 669 F.2d 404 (6th

Cir.1982), for this proposition. In *DuKane*, two distributors competed for the installation of sound and telephone systems at a school. *Id.* at 406. One distributor asked the manufacturer not to sell equipment to the plaintiff distributor for installation. *Id.* at 407. The first distributor also conspired with other competing distributors not to sell equipment to the plaintiff. *Id.* Citing the Third Circuit's decision in *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3rd Cir.1979), the Court ruled the restraint a *per se* group boycott since the "'desired impact [of the restraint was] horizontal and on the dealer, not the manufacturer, level.'" *DuKane Corp.*, 669 F.2d at 411 (quoting *Cernuto*, 595 F.2d at 168). While the restraints may have been applied vertically, the thrust and effect of the restraint was to protect the defendant distributors from horizontal competition. *Id.* at 412.

■ *DuKane* is distinguishable from the facts here, and the plaintiffs' reliance on *DuKane* is otherwise misplaced. First, the defendants in *DuKane* conspired to rid plaintiff, in totality, as a competitor by agreeing not to sell any equipment to the plaintiff. Here, there is no allegation that the defendants conspired to completely exclude the plaintiffs from the relevant markets. Second, *DuKane did* involve a horizontal agreement since the defendant distributors, in addition to conspiring with the manufacturer, conspired among themselves to exclude plaintiff as a competitor. Here, there has been no allegation that the defendant dealers conspired among themselves. *See Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.*, 691 F.2d 241, 244–45 (6th Cir.1982) (holding no *per se* group boycott where restraint, unlike *DuKane*, involved no horizontal component since agreement existed only between manufacturer and retailer of transport services). Third, the restraint in *DuKane* was clearly a "naked restraint" intended to destroy competition. Plaintiffs have failed to adequately allege anticompetitive animus in this case. The bribery scheme was designed to steal profits, not destroy competition.[44] *See, e.g.,*

---

44. Plaintiffs do allege, in conclusory fashion within its section 2 claim, that defendant *Honda*

intended to drive plaintiffs out of the competing market in an attempt to monopolize. *See, e.g.,*

Borman Compl. ¶ 137. Finally, *DuKane's* reasoning that the restraint was horizontal because its *effects* stifled competition at the same level of distribution is unpersuasive.

This last point was explicitly addressed by the Supreme Court in *Business Electronics v. Sharp Electronics,* 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). A retailer of electronic equipment complained to the manufacturer that the plaintiff, a competing retailer, was price cutting. *Id.* at 721, 108 S.Ct. at 1517–18. The retailer threatened the manufacturer with termination if the manufacturer did not terminate its distribution arrangement with plaintiff. *Id.* The manufacturer terminated the plaintiff, and the other retailer became the exclusive dealer in the relevant geographic area. *Id.* The Court held the *per se* approach inappropriate with respect to such a restraint. *Id.* at 724–36, 108 S.Ct. at 1519–26. In rejecting the plaintiff's argument that the restraint was really horizontal in nature, the Court reasoned:

> Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints.... The dissent apparently believes that whether a restraint is horizontal depends upon whether its anticompetitive *effects* are horizontal, and not upon whether it is the product of a horizontal agreement. That is of course a conceivable way of talking, but if it were the language of antitrust analysis there would be no such thing as an unlawful vertical restraint, since all anticompetitive effects are by definition horizontal effects.... [A] restraint is horizontal not because it has horizontal effects, but because it is the product of a horizontal agreement.

*Id.* at 730 & n. 4, 108 S.Ct. at 1523 & n. 4 (citation omitted). The Court rejected the group boycott theory outright since the agreement was not between competitors, but between manufacturer and retailer. *Id.* at 734 & n. 5, 108 S.Ct. at 1525 & n. 5.

 On its facts, *Business Electronics* involved a far more egregious restraint designed to exclude competition than the bribery scheme at issue in this case. Indeed, the very goal of the restraint in *Business Electronics* was to eliminate price competition, a goal ultimately fulfilled. Here, no agreement has been alleged by which defendant dealers sought to restrain price competition or to entirely exclude plaintiffs from competing. The preferential allocations occasioned by bribes might constitute fraud and common law violations in this case, but they do not constitute *per se* violations of the Sherman Act. *See also Gregoris,* 630 F.Supp. at 906 (finding that bribery scheme between car manufacturer and dealers by which dealers received favorable allocations was vertical non-price fixing restraint and therefore not *per se* violation); *Jim Forno's Continental Motors, Inc. v. Subaru,* 649 F.Supp. 746, 753–54 (N.D.N.Y.1986) (finding unlawful car allocations to dealers not to be *per se* violation).

### B. Robinson–Patman Act Claims

Plaintiffs' second antitrust theory arises under section 2(c) of the Robinson–Patman Act. Section 2(c) provides as follows:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C. § 13(c).

 The Robinson–Patman Act was enacted to curb tactics that had been developed by large buyers and sellers to circumvent the discriminatory price provisions of

---

Borman Compl. ¶ 335. Since Honda is not a competitor of plaintiffs, this allegation alone is insufficient to demonstrate that anticompetitive animus was at the heart of the bribery scheme.

the Clayton Act. *See generally Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 991–93 (4th Cir.1990). Rather than forcing direct price concessions which violated the Clayton Act, monopolists were using indirect price concessions to achieve the same goal. *Id.* at 992. Section 2(c) was particularly directed at the use of "dummy" brokerage fees whereby suppliers would pay commissions to persons employed by large chain store buyers when no service was actually rendered by such employees. *Seaboard Supply*, 770 F.2d at 371. Such conduct allowed sellers to secure sales, and buyers to secure price rebates in the form of commissions. *See id.*

Although "dummy" brokerage fees constituted the species of the problem that the Robinson–Patman Act addressed, section 2(c) is broadly phrased and covers a generic practice: discrimination in the pricing and distribution of goods because of a buyer's or a seller's demand for a receipt of benefits below or above the stated price by way of rebate, discount, payment (direct or indirect) or otherwise. The Act also makes unlawful the conferral of such benefits by the other party. The course of conduct alleged by plaintiffs in this case is an iteration of this practice and falls squarely within the literal terms and the intendment of the statute. According to plaintiffs, Honda executives, acting within the scope of their authority, demanded that dealers make payments or provide gifts to them in order to purchase vehicles which Honda zone managers had the discretionary authority to allocate. The defendant dealers at least acquiesced in (and perhaps encouraged) these demands and therefore received more of the allocated vehicles to plaintiffs' detriment. This, in effect, mirrors the practice of charging "dummy"

brokerage fees. Here, it is the manufacturer/supplier who is alleged to have possessed leverage and demanded payments to third parties (the executives in their personal capacity) that ultimately benefitted the manufacturer/supplier itself. The alleged benefit was the reduction in compensation that American Honda had to pay to its executives by virtue of the payments and gifts that they were receiving from dealers.

 Defendants argue that plaintiff's claim is flawed because they have failed to allege any independent antitrust injury. While I recognize that there is a split of authority on the issue, *compare Federal Paper Bd. Co., Inc. v. Amata*, 693 F.Supp. 1376, 1388–89 (D.Conn.1988), *with, Metrix Warehouse v. Daimler–Benz Aktiengesellschaft*, 716 F.2d 245, 247 (4th Cir.1983), in my judgment such an allegation is unnecessary. In enacting section 2(c) of the Robinson–Patman Act, Congress legislatively declared that the practices which it prohibited were anticompetitive. In order to establish a claim under the Act all that a plaintiff need show is that as a result of such a practice he suffered identifiable harm proximately caused by the statutory violations. Plaintiffs have done so here. According to their allegations, they lost profits on the sale of vehicles that were allocated to other dealers for payments and gifts that were made in violation of the Act. Of course, plaintiffs ultimately will have to present competent evidence of concrete loss in regard to their Robinson–Patman claims just as they will have to do in regard to their RICO and other claims. *See, e.g., Capital Ford Truck Sales, Inc. v. Ford Motor Co.*, 819 F.Supp. 1555, 1569–70 (N.D.Ga.1992). However, such evidence alone will suffice for Robinson–Patman purposes. *See, e.g., Metrix Warehouse*, 716 F.2d at 247.[45]

45. Citing *Stephen Jay Photography*, defendants contend that in a commercial bribery case such as this the Robinson–Patman Act does not apply unless the alleged payment was made to someone who has breached a fiduciary duty that she owes to her principal. From this it flows, so argue defendants, that plaintiffs have failed to state a claim since, according to their own allegations, Honda executives did not breach any fiduciary duty that they owed to their employer but, instead, were acting within the scope of their authority. Defendants have misread *Stephen Jay Photography* and created a false syllogism. In that case the Fourth Circuit ruled that in determining whether a person to whom payments are made in connection with a sales transaction is acting as a purchasing agent or similar intermediary for the buyer, it is appropriate to examine whether she stands in a fiduciary relationship to the buyer. *See Stephen Jay Photography*, 903 F.2d at 992–93. The court did not suggest that there had to be a breach of that relationship in order for a Robinson–Patman violation to be established. Nor could such a holding be feasible. In the classic "dummy broker"

## V.

Plaintiffs assert claims under the Dealers' Day in Court Act ("DDCA"), 15 U.S.C. §§ 1221 et seq. The DDCA provides a cause of action for automobile dealers against automobile manufacturers who fail to "act in good faith in performing or complying with any terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise." Id. § 1222. "Good Faith" is narrowly defined by the Act:

> The term "good faith" shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party *freedom from coercion, intimidation, or threats of coercion or intimidation from the other party.*

Id. § 1221(e) (emphasis added).

■■■ Courts have universally concluded that lack of "good faith" has a limited and restricted meaning; it does not mean simple unfairness or breach of a franchise agreement, but rather "actual or threatened coercion or intimidation" imposed upon the dealer by the manufacturer. See, e.g., Wallace Motor Sales v. American Motors Sales Corp., 780 F.2d 1049, 1056 (1st Cir.1985) ("[T]he mere fact that a dealer may have felt it had been coerced or intimidated is not sufficient."). In keeping with the intended narrow scope of the Act, and to prohibit a broadened definition of "coercion," several circuits have also concluded that coercion or intimidation must include a "wrongful demand" which will result in sanctions if not complied with. See id. (citations omitted). "Coercion" and a "wrongful demand" necessarily require a showing that a dealer perceived a threat of sanction if it did not embark on a course of conduct intended by the manufacturer. See Sherman v. British Leyland Motors, Ltd., 601 F.2d 429, 445 (9th Cir.1979) (noting that courts must consider "not only whether a manufacturer has brought pressure to bear on the dealer, but its reason for doing so"); H.D. Corp. of Puerto Rico v. Ford Motor Co., 791 F.2d 987,

991 (1st Cir.1986) ("That plaintiffs may have felt 'forced' to cover by attempting to sell parts and accessories on the open market does not alter this conclusion, because there is nothing in the complaint to suggest that defendants refused to repurchase the parts and accessories in order to compel such a sale.").

■■■ Despite their conclusory allegations that they felt "coerced and intimidated" into purchasing vehicles from dealer defendants at high prices because of the bribery scheme, plaintiffs' complaints are plainly insufficient to establish a DDCA claim against any Honda defendant. Plaintiffs have made no allegation that Honda executives threatened them with termination, or that other dealers would get more cars, if they did not embark on a certain course of conduct. Nor have they alleged that they felt "forced" or "compelled" to purchase cars from other dealers because they thought they would be sanctioned. They purchased vehicles from other dealers because they were not getting enough to keep up with demand, not because they felt they would be sanctioned by Honda if they did not. If Honda executives had elicited bribes from plaintiffs with the threat that allocations would go to other dealers if not paid, then the elements of coercion and wrongful demand necessary to establish a claim would be present. But plaintiffs make no allegation that Honda executives approached them with a quid pro quo. Indeed, they specifically aver that they had no knowledge regarding the alleged bribery scheme until certain Honda executives pleaded guilty to criminal indictments after a criminal investigation. See, e.g., Borman Compl. ¶ 225.

Plaintiffs contend that an *explicit* "wrongful demand" is not required to state a claim. Rather, coercion and wrongful demand can be inferred from a course of conduct. See Borman Opp'n at 58-9. In support of this proposition, plaintiffs rely heavily on *Marquis v. Chrysler Corp.*, 577 F.2d 624 (9th Cir.1978), which held that a wrongful demand can be implicit and inferred from the facts and circumstances "without a showing of for-

---

situation which clearly falls within the purview of the Act, the broker who on behalf of a large-scale purchaser receives payments from a suppli-

er and then turns them over to her principal has breached no fiduciary duty to the latter.

mal demand." *Id.* at 633. While *Marquis* is against the weight of authority, it is inapposite since there was evidence of at least implied coercion in that case. The dealer was compelled to meet certain sales quotas or face the threat of franchise termination, all in furtherance of the manufacturer's unlawful motives. *See id.* at 634–35. The dealer was in fact terminated. Here, there is no evidence of an implied coercion. Again, according to plaintiffs' own allegations, plaintiffs had no idea they were required to pay bribes or face the threat of decreased allocations and inadequate "mixes." Their argument that they were "forced" to purchase vehicles from other dealers as the result of the scheme,[46] a scheme they had no knowledge of, fails to establish the coercive relationship between them and Honda necessary to make out a DDCA claim. *See H.D. Corp. of Puerto Rico,* 791 F.2d at 991; *see also Lawrence Chrysler Plymouth, Inc. v. Chrysler Corp.,* 461 F.2d 608, 610 (7th Cir.1972) ("The [DDCA] does not provide a new remedy for breach of contract but creates a new cause of action, an indispensable element of which is ... a lack of good faith in which coercion, intimidation, or threats thereof, are at least implicit"), *cert. denied,* 409 U.S. 981, 93 S.Ct. 317, 34 L.Ed.2d 245 (1972).

VI.

For the foregoing reasons, the motions to dismiss are granted in part and denied in part, and plaintiffs are granted leave to amend. A separate order is being entered herewith.

---

**46.** Plaintiff Breakaway also alleges that it was "coerced" into withdrawing its application for an additional dealer point. If it did not submit a "weaker" application, Breakaway claims it would have no chance at receiving the award. Breakaway Opp'n at 96. Breakaway's complaint makes no allegation that Honda executives made any threats to this effect. *See Breakaway* Compl. ¶¶ 169–175. Breakaway also argues in its opposition that Honda "coerced" it into falsifying sales reports and into buying unpopular models. These allegations, however, are not contained in Breakaway's complaint.